**BROWN v. EASTERN STATES CORPORATION et al.**
**Civ. No. 4699.**

United States District Court, D. Maryland.
Oct. 26, 1949.

---

5. See International Refuge Organization v. Republic Steamship Corporation, D.C., —— F. Supp. ——. [Rehearing pending.]

Simon E. Sobeloff and Eugene Feinblatt, of Baltimore, Maryland, and David I. Shivitz, of New York City, for plaintiff.

George Cochran Doub (Marshall, Carey & Doub), of Baltimore, and Horace R. Lamb (LeBouef & Lamb), of New York City, for defendants.

WILLIAM C. COLEMAN, Chief Judge.

This is a suit brought by the plaintiff, Arthur Brown, a citizen of New York, against Eastern States Corporation, an investment company incorporated under the laws of Maryland, and the individual defendants who are officers and members of the Board of Directors of that corporation, to enjoin all of the defendants from putting into effect a plan which was presented under date of August 30, 1949, to the preferred stockholders of that corporation, whereby they were offered common stock of the St. Regis Paper Company (of which Eastern States Corporation owned 1,000,000 shares) and cash, in exchange for outstanding shares of preferred stock of Eastern States Corporation.

The proceeding was originally begun and a preliminary injunction obtained in the Circuit Court No. 2 of Baltimore City solely on the bill of complaint and affidavits, but was then removed to this Court under

28 U.S.C.A. § 1441(b), on the ground that, as the bill of complaint alleged, questions of violation of federal laws were involved.

The following is a summary of the major features of the terms of the proposed exchange, as set forth in Eastern States' plan submitted to its preferred stockholders:

"For each share of Series A $7 Dividend Preferred Stock tendered to the Corporation for exchange, the Corporation will transfer and deliver 9 shares of St. Regis Paper Company Common Stock of the par value of $5 per share, now held by the Corporation, and $4.79 in cash.

"For each share of Series B $6 Dividend Preferred Stock tendered to the Corporation for exchange, the Corporation will transfer and deliver 8⅓ shares of St. Regis Paper Company Common Stock of the par value of $5 per share, now held by the Corporation, and $4.43 in cash.

    \*    \*    \*    \*    \*    \*

"The exchange of the outstanding shares of the Corporation's Preferred Stock on the terms stated above, assuming all of the 100,000 shares of Preferred Stock are tendered for exchange, would reduce the Corporation's holding of St. Regis Paper Company Common Stock by a total of 860,000 shares, or from 1,000,000 shares to 140,000 shares, and would require the payment by the Corporation of $457,400 in cash (exclusive of the expenses of the proposed exchange).

"On August 1, 1949 St. Regis Paper Company Common Stock had a market value of $6.75 per share. Based upon such market value, a holder of one share of Series A $7 Dividend Preferred Stock tendering such share for exchange would receive in exchange St. Regis Paper Company Common Stock having a value of $60.75 and $4.79 in cash, or a total of $65.54, and a holder of one share of Series B $6 Dividend Preferred Stock tendering such share for exchange would receive St. Regis Paper Company Common Stock having a value of $56.25 and $4.43 in cash, or a total of $60.68.

"Assuming all of the outstanding Preferred Stock is tendered for exchange pursuant to the terms stated above, and assuming a market valuation of $6.75 per share (or a total of $6,750,000) for the Corporation's 1,000,000 shares of St. Regis Paper Company Common Stock, upon such exchange the holders of the Series A and Series B Preferred Stocks, as a class, would receive a participation equal to approximately 87% of the total net assets of the Corporation, and there would remain for the holders of the presently outstanding shares of Common Stock, as a class, a participation equal to approximately 13% of the total net assets of the Corporation.

"Assuming, further, that all the 100,000 outstanding shares of Preferred Stock of the Corporation is tendered for exchange on the terms stated above, so that all of the remaining net assets, amounting, as stated above, to approximately 13% of the total net assets of the Corporation, are reserved for the Common Stock as a class, it is estimated that in a liquidation and dissolution of the Corporation at the market price on August 1, 1949, of $6.75 per share for the 140,000 shares of St. Regis Paper Company Common Stock retained by the Corporation, the remaining net assets of the Corporation would have a net value of approximately $945,000 or approximately $1.65 per share for the 572,132 outstanding shares of Common Stock.

"If less than all of the outstanding shares of Preferred Stock are tendered for exchange, the liquidating value of unexchanged shares of Preferred Stock would be enhanced, and the amount of the enhancement would increase in direct proportion to the number of shares of Preferred Stock that are tendered for exchange.

"Assuming, (1) that the Corporation could have sold its entire holdings of 1,000,000 shares of Common Stock of St. Regis Paper Company on August 1, 1949, at the then market price of $6.75 per share, and assuming (2) that effective as of August 1, 1949, the voluntary liquidation and dissolution of the Corporation could have been authorized by the requisite vote of the stockholders, it is estimated that in such liquidation and dissolution the holders of the shares of the Series A $7 Dividend

Preferred Stock and of the Series B $6 Dividend Preferred Stock would be entitled to receive approximately $72 per share, such estimate being subject, however, to a final determination and payment of all taxes and other liabilities of the Corporation, then due and payable, and of the actual cost and expense of such liquidation and dissolution; and in such liquidation and dissolution the holders of the outstanding shares of Common Stock would receive nothing. * * *

"Assuming, further, that on August 1, 1949 the 1,000,000 shares of Common Stock of St. Regis Paper Company could have been sold at a market price (the market price would have to be not less than $20½ per share) [the highest quoted market price in the 10 year period 1939 to August 1, 1949 was 15⅛] to yield an amount sufficient to pay the full amount to which each holder of Preferred Stock is entitled to receive on voluntary liquidation and dissolution of the Corporation, * * * each holder of Series A $7 Dividend Preferred Stock would be entitled to receive in such liquidation and dissolution the sum of $100 plus accumulated arrears of dividend on said date, which amounted to $113.35, or a total of $213.35 per share, and each holder of Series B $6 Dividend Preferred Stock would be entitled to receive in such liquidation and dissolution the sum of $100 plus accumulated arrears of dividend on said date, which amounted to $97.1572, or a total of $197.1572 per share, both of such total amounts being subject, however, to a final determination and payment of all taxes and other liabilities of the Corporation, then due and payable, and of the actual cost and expense of such liquidation and dissolution; and in such liquidation and dissolution the holders of the outstanding shares of Common Stock would receive nothing."

Three major grounds are asserted in the bill of complaint as the basis for granting injunctive relief and for an accounting by the individual defendants for alleged waste of the Corporation's assets committed by them in connection with the plan. These grounds are first, wilful, fraudulent deception practised upon all classes of stock-

holders of the corporation by reason of the individual defendants' promotion and offering of the plan without the prior calling of a meeting of stockholders of any class, and without any prior vote, approval or consent of the stockholders in any form whatsoever. It is claimed that this action on the part of the individual defendants was all pursuant to a conspiracy on their part to cheat and defraud the Corporation's stockholders, and more specifically, that the plan is designed to serve the interests and purposes only of defendant R. K. Ferguson, president of the Company, and, as alleged, the chief moving spirit in the whole scheme, and of the other defendant directors acting with him. Second, it is claimed that such action on the part of the individual defendants is ultra vires; and third, that the plan as offered violates the Maryland corporation laws.

We will first consider plaintiff's second and third contentions, and will deal with them as one, since they are closely interrelated, and, in effect, as presented they raise basically the same questions.

It is true that the plan was never formally submitted to the Corporation's stockholders for their acceptance or rejection, but the stockholders on April 13, 1949, at their last meeting held prior to submission of the plan, considered and formally adopted a change in the Corporation's investment policy so as to possess more freedom of action with respect to concentration of its investments. In furtherance of this change, amendments were adopted in the Corporation's Registration Statement as filed with the Securities and Exchange Commission, and among these amendments is the following: "In respect of the Registrant's present holding of 1,000,000 shares of the outstanding common stock of St. Regis Paper Company it is not the policy of Registrant to retain this investment as a permanent investment, at least not to the extent now held. Subject to market conditions and other favorable circumstances, as may be determined by the Registrant's Board of Directors from time to time, it will be the policy of Registrant to sell, exchange or make other dispositions of all or any part of this in-

vestment as the Board of Directors may determine from time to time." Conceding that this was not the equivalent of formal action by the stockholders with respect to the precise plan here in issue, we are nevertheless satisfied that failure to present this plan to the stockholders for their formal acceptance or rejection violated no provision of the Maryland Corporation laws, but on the contrary, is expressly permitted.

■ The Corporation's charter explicitly authorizes it to purchase and cancel shares of stock consistent with the laws of Maryland, and specifically as to preferred stock, it provides (Art VI, 1 c) that "The board of directors shall have full power and authority to prescribe the manner in which and, subject to the limitations and provisions herein contained, the terms and conditions upon which preferred stock may be redeemed from time to time." Under Section 54(2) of Article 23 of the Maryland Corporation laws (Annotated Code of Maryland 1939, Art. 23, Sec. 54(2)), a corporation may purchase for retirement, and thereby retire, any shares of its own stock subject to redemption at the time of such purchase. No proceeding for the reduction of the issued capital stock of the corporation or amendment of its charter is necessary to effectuate such retirement or reduction, since this automatically reduces the amount of the issued capital stock by the amount represented by the shares thus retired. Therefore, since the preferred stock of the defendant Corporation is, by its charter, subject to redemption, Section 54(2) confers upon the Corporation statutory authority to purchase such shares. Furthermore, this right may be exercised by the board of directors without obtaining authority so to do from the stockholders. Section 12 of Article 23 of the Maryland Corporation laws (Annotated Code of Maryland 1939, Art. 23, Sec. 12), provides that the board of directors may exercise all of the powers of the corporation, except such as are by law or by the charter or by-laws conferred upon or reserved to the stockholders. Neither the Maryland Corporation laws nor the charter or by-laws of the corporation confer upon, or reserve

to its stockholders the power to purchase for retirement shares of stock subject to redemption under Section 54(2) above referred to. Therefore, the preferred stock of the Corporation being subject to redemption, it is clear that the Corporation may purchase such shares for retirement under this section, without formal authorization of the shareholders.

■ Under the plan, the Corporation proposes to acquire through voluntary tender, shares of its preferred stock, which are subject to redemption, for shares of St. Regis Paper Company common stock which constitute a marketable asset of the Company, and also for cash. Under paragraph (2) of the "Conditions of Exchange" set forth in the plan, it is provided that "All shares of Preferred Stock tendered to the Corporation and exchanged pursuant to the terms stated above will be retired and will not thereafter be reissued, and the authorized capital stock of the Corporation will be reduced accordingly." Thus it is clear that the essential character of the Corporation's acquisition of tendered shares is that of a purchase.

Clearly, the acquisition of shares for a valuable consideration is a purchase, although a portion of the consideration may consist of something of realizable value other than money. Section 54(2) of the Maryland Corporation laws contains this further very pertinent provision: "For the purposes of succeeding paragraphs of this Section every purchase for retirement of shares of stock subject to redemption shall be deemed and taken to be a redemption thereof and the term 'purchase' whenever used therein shall be construed not to include either any purchase for retirement of shares of stock subject to redemption or any redemption thereof." The effect of this provision, therefore, is to render inapplicable to purchases under Section 54(2) the provisions of Section 54(3), (4), (5), (6). Thus we need not quote from any of these sections because clearly inapplicable since they relate to situations not before us. The following provision in Section 54 (7) is, however, pertinent, as is also Section 54(8), which we hereinafter consider: "No such corporation shall purchase any

shares of its own stock unless the assets of the corporation remaining immediately after such purchase shall be not less than the debts of the corporation plus the amount of its issued capital stock, and no such corporation shall redeem any shares of its own stock unless the assets of the corporation remaining immediately after such redemption shall be not less than the debts of the corporation plus the amount of its issued capital stock (exclusive of the stock so redeemed). If any such purchase or redemption is made in violation of this paragraph the persons receiving payments therefor shall severally be and remain liable to the corporation or its receiver, trustee or other person winding up its affairs to the extent of the payments to them respectively for the debts of the corporation existing at the time of such payments, or, in the case of a purchase out of surplus created by a reduction of the amount of issued capital stock under Section 32, for the debts of the corporation existing at the time of such reduction as provided in Section 32."

The testimony shows that in the event all shares of preferred stock are acquired upon tender, there will remain assets of the Corporation of actual value, as of June 30, 1949, of $968,998 (accepting the quoted market value of $6,625,000 for the St. Regis Paper Company common stock as of June 30, 1949), as compared with current liabilities of $16,354 and issued capital stock i. e., common stock of $572,132. If carrying book value of the St. Regis stock on the books of the Corporation at $5 per share is taken as of June 30, 1949, there will remain assets of the approximate value of $800,000. Thus on either valuation basis the above quoted provision of Section 54(7) is complied with.

It is contended by plaintiff that our conclusion is erroneous because it goes counter to the express provisions of Section 38(a) of Article 23 of the Maryland Corporation laws (Annotated Code of Maryland 1939, Art. 23, Sec. 38(a) ). The pertinent parts of that section are as follows:

"Any corporation of this State having capital stock (except railroads) may sell, lease, exchange or transfer all, or substantially all, its property and assets, including its good will and franchises, in the manner following:

"An agreement containing the terms and conditions of the proposed sale, lease, exchange or transfer, as the case may be, shall be submitted to the board of directors of the corporation, which shall pass a resolution declaring that such sale, lease, exchange or transfer is advisable and calling a meeting of the stockholders of the corporation to take action thereon. * * *"

Upon the required corporate authorization, as above, for the disposition, in whatever manner, of all or substantially all of the Corporation's assets, it is further provided (Section 38(b) ) that any dissenting stockholder shall be entitled to receive an amount equal to the fair value of his stock upon the date of the sale, lease, exchange or transfer; and that the procedure provided for determining such value shall not prevent or delay the execution and performance of the agreement, and the vendee, lessee or grantee shall take the property of the corporation subject to its debts and liabilities, including the claim of every dissenting stockholder if such dissenting stockholder shall have notified the vendee, lessee or grantee in writing of such claim within 20 days after the sale, lease, exchange or transfer.

From the above analysis, we are satisfied that Section 38 contemplates a sale, lease, exchange or transfer of corporate assets to a third party vendee, lessee or grantee for a valuable consideration, as contrasted with disposition of such assets to stockholders in redemption of their stock, and that therefore the redemption of the whole or any part of the preferred stock of Eastern States Corporation or the purchase thereof for retirement at less than the redemption price as set forth in the present plan, may not be deemed a sale, exchange or transfer within the meaning of Section 38. Of course, a redemption, or purchase of shares subject to redemption, necessarily involves a withdrawal of assets and to that extent is a partial liquidation. Such a result being implicit in any redemption or purchase of shares subject to redemption, is not

merely impliedly, but expressly authorized by Section 54(2) without requiring stockholders' approval.

■ In addition to, and independently of the provisions of the Maryland law which we have just analyzed, paragraph (8) of Section 54, provides that "Notwithstanding any provision of this section, any such corporation which is organized for the purpose of, and substantially all the business of which consists of, holding, investing or reinvesting in stock or securities may, if so provided in its charter, redeem or purchase from its stockholders shares of its own stock for not exceeding their proportionate interests in the properties of the corporation, or for not exceeding the cash equivalent of such proportionate interests." Thus, this section gives express authority to the Eastern States Corporation to do what it proposes to do under the plan in controversy. This section expressly confers upon holding companies such as Eastern States the power to redeem or purchase its shares of stock for not exceeding the proportionate interest in the corporation's property. So this section is additional, direct support for our conclusion that the action of the board of directors does not need the authorization of stockholders to make it valid. The proportionate interest referred to means asset value. Since Eastern States is redeeming the stock at less than net asset value, it is being acquired for not exceeding the proportionate interest of the stockholders. In other words, the redemption as provided for in the plan is authorized both generally, by paragraph (2) and specifically, by paragraph (8) of Section 54.

If Section 38 were intended to apply to a situation such as that now in issue this would mean that the tendering stockholders would receive the St. Regis stock subject to the claims of dissenting stockholders for the enforcement of which no means is, or could be, as a practical matter, provided in the law. So, Section 38 must have been designed to apply only where all or substantially all of a corporation's assets are disposed of to a third party, used in the ordinary business sense, as opposed to stockholders. It may be noted parenthetically that the phrase "substantially all" has no statutory definition, but is subject to judicial construction. For example, it has been held that this phrase used in the Revenue Act of 1918, means something more than 84%. See United States v. Cleveland P. & E. R. Co., 6 Cir., 42 F.2d 413.

We have been referred to no Maryland decision which gives to the provisions of the Maryland Corporation laws which we have just construed an interpretation contrary to that which we adopt. Likewise, we have been referred to no decision construing the corporation laws of any other State similar to those of Maryland, which is contra. It is to be assumed that the Securities & Exchange Commission, before giving permission to Eastern States to proceed with its plan, must have given careful consideration to the pertinent provisions of the Maryland law before reaching the same conclusion that we do.

On behalf of plaintiff it is further contended (1) that if the present exchange of stock involved Eastern States giving up its *entire* assets, the rights of the common stockholders would then be completely destroyed without their having been given any chance to vote; and (2) that if the exchange of stock were accomplished by two steps instead of one, that is to say, if Eastern States first sold 87% of the St. Regis stock and then, with the proceeds, redeemed the preferred stock, the first step would require stockholders' approval. From this it is argued that the present plan is an evasion of what was impliedly meant to be required in cases of redemption such as that now in issue. But we do not think so. Section 54 (7) of Article 23 provides, as already pointed out, that no corporation "shall redeem any shares of its own stock unless the assets of the corporation remaining immediately after such redemption shall be not less than the debts of the corporation plus the amount of its issued capital stock (exclusive of the stock so redeemed)." So here is the saving provision in the Maryland law and the answer

to plaintiff's contention. According to the testimony in the present case, Eastern States would have had, as of June 30, 1949, assets of $968,998 as compared with debts of approximately $16,000, and capital stock of the value of $572,132, exclusive of all stock subject to redemption. Thus, the limitation in the Maryland law just referred to is fully met in the present case.

We turn next to the claim made on behalf of plaintiff that the plan and the action of the officers and directors of Eastern States in furtherance of the plan are fraudulent. It is asserted that the company's directors have intentionally refrained from submitting the plan to the stockholders for their approval because they well know that the plan is unfair to all classes of stockholders, both common and preferred, being designed to serve the interests solely of the defendant Ferguson, alleged to be the chief moving spirit behind the plan and of the other defendant directors working in unlawful conspiracy with him. It is further claimed that the plan as set forth in the letter of August 30, 1949, makes only an incomplete disclosure of the true facts in connection with it, and that such disclosure as is made is false and fraudulent because the defendants knew that if the stockholders were afforded an opportunity to act upon the plan with all of the facts before them, they would not consent to its adoption because designed to defraud and mulct them of their rights in the corporation.

More specifically, it is claimed that the plan is unfair to the preferred stockholders to whom it is offered in that it misleads them into believing that the $62.62 average which the plan provides they will receive for their shares of preferred stock is the maximum that any group of preferred stockholders will net under the plan. It is asserted that this deception is accomplished by assuming throughout the letter explaining the plan that the owners of 100% of the preferred stock will avail themselves of the plan, in which event, as the letter sets forth, the preferred stockholders will receive 87% of the total net assets of the corporation, the remaining 13% being left to the holders of the common stock; whereas, 100% of the preferred stockholders cannot in fact avail themselves of the exchange, because the defendant Ferguson is on record in the letter of the plan itself as saying that it is his intention "not to tender any of the shares of the corporation's preferred stock owned by him to the corporation for exchange." In other words, it is claimed that since Ferguson personally owns 3042 shares of Series A preferred stock, and 2083 shares of Series B preferred stock, it is manifest that 100% of the preferred stockholders cannot avail themselves of the exchange, but at most approximately 94%, in which event the assets remaining to the corporation after the distribution, would go, not to the holders of the common stock, but to the holders of the non-exchanged preferred stock, of whom defendant Ferguson is one; and that since the preferred stock has presently a prior claim against the corporation's assets amounting to an average of $203 a share, and thus is entitled to be paid before anything can be distributed to the holders of the common stock, therefore, whereas the holders of preferred stock who elect to exchange will be receiving an average of only $62.62 for their shares, defendant Ferguson, nevertheless, who has elected not to exchange, will find the liquidation value of his shares rising to approximately $203 a share.

It is further asserted that the plan is unfair to the preferred stockholders in that it is being sold to them on the assumption that the market value of the St. Regis Paper Company common stock to be received by them in exchange is only $6.75 per share, because whatever may be the market value of separate shares considered individually or in small lots, the value is not the same with respect to a block of 1,000,000 shares constituting 19.3% of the St. Regis Company's entire outstanding common stock which is the key to control of a vast industrial empire; that such a control block obviously has a value, if a satisfactory purchaser is found, far in excess of its value considered at the market value of individual shares; that defendant Ferguson's primary motive in advancing the plan is to

break up this control block which, in the hands of Eastern States or any single purchaser from that corporation on liquidation, would threaten his control of the St. Regis Paper Company; that nowhere in the plan is it disclosed to the preferred stockholders that Eastern States is sacrificing this additional value attributable to the 1,000,000 shares as a control block over and above the market value of the shares on an individual share basis, and that a further effect of the plan will be to increase defendant Ferguson's voting strength in Eastern States, the preferred stock in arrears having the status of voting stock, thus increasing Ferguson's degree of control over the St. Regis Paper Company.

With respect to the holders of Eastern States common stock, the plan is, likewise, alleged to be fraudulent because any holder of such stock, upon reading the plan, would, it is alleged, get the impression that common stockholders as a class would receive 13% of the net assets of the corporation in place of a presently non-existing equity, whereas actually there could never be, under the plan, a greater acceptance than 94%, since defendant Ferguson is retaining his 6%, and that thus the common stockholders as a class will net absolutely nothing but stand to lose (1) the possibility of enhancement in value of the shares based upon sale to a purchaser to be found as a single control block, and (2) the important advantage from a tax aspect of using a potential $11,-000,000 capital loss as an offset against capital gains, if any, by Eastern States in the ensuing five year period.

These are broad and very serious charges, no part of which we find are sustained by the credible evidence. The only witness who has claimed that the plan is fraudulent is Floyd L. Carlisle Jr., who owns 16,691 shares of common stock of the Corporation and was elected a director in July, 1949. His father had preceded R. K. Ferguson as president of both Eastern States Corporation and St. Regis Paper Company. As respects the witness Carlisle, the Court obtained the impression that the present suit is part of a plan whereby he ultimately may wrest control of Eastern States from Ferguson and secure it for himself and close associates. Of course it is true that motive is not decisive if there had, in fact, been unlawful or fraudulent action on behalf of the company by any of its officers or directors in furtherance of the plan. However, the sum and substance of the most adverse criticism of the plan by any of the witnesses called to testify as brokers who had studied and were familiar with it, in connection with their obligation to advise customers owning Eastern States preferred stock whether to tender their stock under the plan, is that the description of the plan as published is misleading unless very carefully studied and analyzed; and also that the fact that Ferguson, although president of the company and a large holder of both its preferred and common stock, had elected not to go under the plan, creates an anomaly and raises doubt as to whether small stockholders should concern themselves with it if the president of the company himself does not see fit to take advantage of it. In short, such testimony when interpreted most favorably to plaintiff, represents nothing but an expression of brokers' opinion and advice, and forms no sound basis whatsoever for the charge of unlawfulness or fraud involved in the plan. On the contrary, after the Court heard Ferguson's testimony, it became all the more convinced that there was a total absence on his part of any conduct that was ultra vires or for any other reason was questionable, and that the same is true with respect to the conduct of the other officers and directors of the company in furthering the plan, insofar as the testimony has disclosed.

In this proceeding we are not concerned with the wisdom of the plan,—with whether the proposal presented to preferred stockholders is a good or a bad thing from an investment point of view, or whether, from the broader aspect of corporate finance and management, the plan commends itself in the sense that it will be advantageous to both preferred and common stockholders and will be productive of increased net earnings for them. These are questions of judgment, of opinion, not questions of law,

which is equally true with respect to the question whether it would have been *advisable* to have first submitted the plan to the stockholders for their approval.

For the aforegoing reasons the Court concludes that the complaint is entirely lacking in merit; that all of the contentions therein made with respect to the plan in controversy are completely refuted by the great weight of the credible testimony that the Court has heard; in short, that all of these contentions are improvident and specious, and that therefore the preliminary injunction which issued out of the Circuit Court of Baltimore City, prior to the removal of the proceeding to this Court, must be dissolved.

### Supplemental Opinion

Following this Court's order, issued on September 26, 1949, dissolving the State Court injunction for the reasons set forth in the aforegoing opinion, Eastern States Corporation, defendant, renewed its motion to dismiss the suit on the grounds set forth in its previous motion and for the further reason that every issue raised by the amended complaint which plaintiff was permitted to file after removal of the proceeding to this Court, had been fully considered and adjudicated by this Court adversely to the plaintiff. However, since the individual defendants had not yet been served with process, and therefore were not before this Court when the hearing was begun with respect to whether the injunction issued by the Circuit Court of Baltimore City should be dissolved, but some of them were subsequently served, this Court issued an order upon plaintiff to show cause within five days why the defendant Corporation's motion to dismiss should not be granted. Plaintiff answered in due course, asserting, in substance, that he had not had an opportunity as yet to present complete testimony as to all of the issues in the case, and that a further and more complete hearing was necessary in order to determine whether plaintiff's prayers for a permanent injunction and for an accounting should be granted.

The matter was duly heard by the Court on October 7, 1949, on this state of the pleadings and the Court concluded that, in the course of the hearing on the defendant company's motion to dissolve the preliminary injunction, the Court was called upon fully to review and to adjudicate, and did fully review and adjudicate every basic contention made by the plaintiff, as set forth in the Court's lengthy opinion herewith. Furthermore, between the rendition of this opinion and issuance of the order in conformity therewith, and the holding of the hearing on the show cause order, the period within which, under the plan, holders of the preferred stock of defendant Corporation might tender their shares, had expired, that is, on September 30th, and has never been extended although it could be by vote of the Corporation's directors. Approximately 27,000 of the 100,000 shares of preferred stock, or about 27%, were exchanged. Thus any further proceedings with respect to questions raised under the plan would be futile because moot, including the question, much stressed by plaintiff, that the plan embraced a transfer of all or substantially all of the Corporation's assets in violation of Section 38, Article 23, of the Maryland Corporation laws, since it had never been contended that the phrase "substantially all of the assets" as there used meant less than about 80%. Accordingly, there was nothing left for this Court to decide. The possibility that the Corporation's board of directors might, at some later date, afford an additional period of time within which those who had not tendered their preferred shares during the period designated by the plan, might still do so, is no ground for this Court's extending the hearing, since all issues touching the validity of the plan have been fully presented and adjudicated. Therefore, at the conclusion of the hearing on October 7th on the show cause order, the Court granted the Corporation's motion to dismiss the suit.