**HARRIS et al. v. CHICAGO GREAT WESTERN RY. CO.**

No. 10481.

United States Court of Appeals
Seventh Circuit.

July 25, 1952.

Bryce L. Hamilton, Harold A. Smith, Keehn Landis, John C. Slade, Chicago, Ill., Winston, Strawn, Black & Towner, Chicago, Ill., of counsel, for appellant.

Max Swiren, Ben W. Heineman, William P. Rosenthal, Alex Elson, Edward R. Johnston, James A. Sprowl, Wesley G. Hall, Chicago, Ill., Johnston, Thompson, Raymond & Mayer, Chicago, Ill., Swiren & Heineman, Chicago, Ill., of counsel, for appellees.

Before MAJOR, Chief Judge, and DUFFY and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

After extended preparation by the respective parties, two consolidated preferred stockholder class suits against the defendant railway company and its board of directors were, on the eve of trial, settled by written contract of the parties, agreeing that all claims of plaintiffs and their class asserted in the complaints had been fully adjudicated and settled. Following the agreement, the trial court entered a consent judgment finding, among other things, that the actions were proper class suits; that plaintiffs adequately represented all members of the class; that plaintiffs had charged the company and its officers with certain improper action in deferring preferred stock dividends; that defendants had denied the charges, and that the parties had settled their differences. The court entered, as it said, "a final decree," declaring all matters at issue adjudicated, but retaining jurisdiction for enforcement of the judgment and for the purpose of determining reasonable fees and expenses of plaintiffs' attorneys which, by the contract incorporated in the decree, defendant had agreed to pay. Upon hearing of petitions for fees and expenses presented pursuant to the latter provision of the decree, the court allowed a fee of $500,000, to be divided, in specified amounts, among the two sets of attorneys representing the respective plaintiffs, and expenses in the sum of $45,907.76, including a fee of $10,500 to Thos. H. Healy, an expert witness.

Upon appeal defendants contend that, in fixing the fees, the court improperly took into consideration the merits of the litigation, and erroneously held all dividend payments provided for by the agreement to be benefits secured by plaintiffs for their class, whereas the only funds gained which it was proper to consider were the dividends in arrears and they only to the extent of the acceleration and additional assurance of payment provided by the settlement. They insist further that the court improperly gave weight to services not rendered in achieving the benefits obtained, and that the fees and expenses allowed were unjustified in certain other respects.

The two suits, before consolidation, were the Harris and the Zimmerman complaints. The first was instituted by Ray Harris on March 15, 1949 as a preferred stockholder claiming to represent adequately other preferred stockholders and suing as a representative and in behalf of the class. Zimmerman filed a similar complaint on June 8, 1949, which was amended September 25, 1950 to include eight additional preferred stockholders as plaintiffs. In each, defendant railway's directors were named as defendants and in the Zimmerman suit, one Bowles, not a director, was an additional defendant. After May 2, 1950, the two

complaints continued as a consolidated cause.

In substance the charges were that certain common stockholders of the railway company, in control of the corporation, had so manipulated its affairs as to enhance the value of the common stock and depress that of the preferred stock. Important events asserted in support of this charge were the discontinuance of dividends on preferred stock after March 1, 1946, the action of the company in applying its earnings to retirement of debts and for repairs and maintenance of the railway's roadbeds, terminal facilities and other properties, and an attempt to secure from the Interstate Commerce Commission an order authorizing, and to persuade the preferred stockholders to accept, certain debentures in place of preferred stock, all being acts alleged to have been unnecessary, wasteful and wrongful. Plaintiffs insisted that at all times after the deferment of dividends the company's earnings had been sufficiently large to justify payment of accruing current dividends on preferred stock, and prayed that the court direct the company to make whole the preferred stockholders.

Defendants denied all improper actions or motives, saying that, in the judgment of the board and the management, it had been thought advisable to reduce the indebtedness, acquire Diesel locomotives and rehabilitate generally the company's rundown physical properties rather than to pay dividends to preferred stockholders, and that the earnings were not sufficient to do both. They denied that the company had wastefully expended any money for improvements, repairs and maintenance. They asserted that the attempt to secure exchange of preferred stock for debentures had been made for the benefit of preferred stockholders, some of whom were desirous of receiving income immediately, and that the program of debt reduction, dieselization and rehabilitation had improved the position of and enhanced the value of the preferred stock. They admitted that no dividends had been paid on the preferred stock between March 31, 1946 and December, 1949, and that, as of March 31, 1948, unpaid dividends in the amount of $7.50 had accumulated on each share.

In 1950 another committee for preferred stockholders, known as the Campbell Committee, intervened, opposing the relief sought by plaintiffs.

The case having come to issue, extended preparation for trial followed. The cause was eventually set for trial in May, 1951. On May 4, the parties entered into the settlement agreement whereby each released and discharged the other forever from any and all claims and liabilities of any nature arising from or by virtue of any charges in the complaints or in the answers. The settlement further provided that the company would pay, at all events, its regular annual preferred dividend of $2.50 per share for the calendar year 1951, and, on or before July 16, 1951, $3 per share on account of the accumulated arrearages; that, during the year 1952 and thereafter, until all remaining dividend arrearages amounting to $3.37½ per share should be fully paid, it would devote at least 60% of its net earnings to the payment, first, of the regular annual preferred dividends, and second, of the balance of the accumulated arrearages. In addition, the company agreed to pay the reasonable expenses incurred by plaintiffs in prosecuting the litigation and the reasonable fees of their attorneys, in such amounts as the District Court should allow, subject, however, to the right to appeal. On June 7, 1951, the court entered the consent judgment heretofore mentioned, whereby it found that the agreement was fair and for the best interests of the preferred stockholders and that by the "final decree" all matters were finally disposed of, except for the reserved jurisdiction mentioned.

Upon the hearing upon application for fees, voluminous evidence was submitted by the respective parties. The court, on June 28, 1951, entered findings of fact, conclusions of law and an order allowing to the attorneys for Zimmerman, fees in the sum of $305,555 and plaintiffs' reasonable expenses of $23,045.09, and, to the attorneys for Harris, $194,445 and reasonable expenses of $12,362.67. In addition the

court directed the company to pay Healy, an expert witness, for services, $10,500.

The court found that, despite some differences in the original complaints, the objectives of the consolidated proceedings had been in substance, (a), to compel the resumption of regular annual dividends of $2.50 per share upon the preferred stock, amounting to $915,260 per year; (b), to liquidate accumulated arrearages upon the preferred stock amounting to $2,745,780, or $7.50 per share; (c), to obtain a declaration that dividends unpaid which had not been accumulated upon the books of the company had in fact continued and still would continue to accumulate upon the preferred stock, which unpaid and unaccumulated dividends, at the time of the filing of the suit, amounted to $915,260, or $2.50 per share, and eventually grew to $1,487,297, or $4.06¼ per share, and, (d), to compel the discontinuance of an application of the railway then pending before the Interstate Commerce Commission for approval of the plan to exchange certain new securities for the preferred stock.

It found that each of plaintiffs had employed New York and Chicago lawyers, members of three different firms in each instance, who had represented them; that preferred dividends were cumulative for three years but not thereafter; that no dividends had been declared between March 31, 1946 and December, 1949, and that the accumulated arrearage was then $7.50 per share; that the company resumed payment of dividends upon preferred stock in December, 1949; that the regular annual dividends declared and paid subsequent to the filing of proceedings amounted to $3.43¾ per share, and that, in addition, during 1950 and 1951 the railway company had paid $1.12½ per share upon the accumulated arrearage and thereby reduced it to $6.35½ per share.

The court found that plaintiffs' attorneys had examined voluminous documentary evidence, made exhaustive pre-trial oral examination of numerous witnesses, and taken numerous depositions, containing in all some 3,452 pages; that this preparation was "equivalent to a complete trial of a major piece of litigation covering some six trial weeks"; that, after preparation for trial, on May 4, the parties had settled their controversies in an agreement approved by the court as fair and reasonable; that plaintiffs' attorneys had expended 7,818¾ hours and in addition 21½ days in attending to the consolidated proceedings; that there was no unnecessary duplication of services; that whether and to what extent the attorneys would receive compensation was at all times uncertain and contingent, depending entirely upon the success of their efforts; and that the questions involved were difficult and complex and required the exercise of able professional skill upon the part of counsel.

In determining the benefits realized by the preferred stockholders, the court found that the resumed dividends realized by virtue of plaintiffs' attorneys' services, after suit was brought, amounted to $1,670,349; that under the agreement the company obligated itself to make payments in 1951 of $1,784,757 and that, in the years 1952–53 under the agreement and the judgment of the court, dividends of $3,066,121 would be paid; that accumulated dividends paid after institution of the proceedings and all others which would be paid, total $6,521,227, of which $4,850,878 has been paid or will be paid pursuant to the agreement; that large monetary and other benefits have been conferred upon the preferred stockholders individually and as a class.

At the suggestion of plaintiffs or at that of the defendant or ultimately at the implied invitation of both, it is not entirely clear which, the court proceeded to make findings of fact upon the merits of plaintiffs' claims, though they were not at issue and not on trial. It found that substantially all claims of the respective complaints had been proved. Its findings, numbers 33 to 39 inclusive, covering this field, had no place in a hearing upon the reasonableness of the fees of the attorneys in preparation for trial and in procuring the benefits set forth in the settlement agreement. The latter were the only matters about which the court required information, namely, one, what preparation had plaintiffs' attorneys made, what services had they rendered in this respect, how

much time had they devoted to this preparation and, two, what were the benefits resulting from the final decree approving the settlement with the company. That decree, to which both parties consented, measured the recovery realized. To it and it alone could the court look to measure the benefits produced as the yardstick for ascertainment of results, for what was gained is fixed and determined in it. Of course, what counsel did, the time they spent, the services they rendered in the preparation were all material and relevant and the court properly heard extensive evidence as to each of these inquiries. But neither question in the slightest degree involved a determination of the merits of either plaintiffs' claims or of defendant's denials, but merely a finding of what plaintiffs had done and what they had gained. As counsel for each of the parties said from time to time[1] during the course of the hearing, all evidence was offered and received, not as proof of the truth of the averments of the complaints, which had been settled and adjudicated, but for the purpose of informing the court just what services had been rendered, their nature and their volume. Evidence as to the claims and denials could have no other place in the hearing, whether offered by plaintiffs or by defendant. It may be that this false issue became intermingled with the relevant and pertinent inquiries before the court because of the over-zealous ardor of counsel in asserting their respective contentions under their respective theories. But the findings mentioned were wholly irrelevant, immaterial and unrelated to the issue presented to the court and, therefore, clearly erroneous. They must be excised from the record.

How far the court's judgment may have been affected or influenced by these immaterial and irrelevant findings upon issues not presented, it is impossible to say, but that the court considered them material and relevant and, therefore, of importance is apparent from its having adopted the findings in this respect tendered by attorneys for plaintiffs and by overruling objections made thereto by attorneys for defendant. To the extent that this factor entered into the court's disposition, error resulted.

Ultimately, we think, it became of no importance in this hearing as to why the preferred dividends were not paid in 1946–47 and 1948. Under defendant railway's charter, according to the report of the Interstate Commerce Commission's supplemental report in its reorganization, (242 I.C.C. 747, 752), the preferred stockholders were entitled to a dividend of $2.50 per share before the payment of any dividend on any other stock of the company and such dividends, if unpaid, whether earned or not, were to accumulate until they aggregated 15% of the the par value of the stock $50. It matters not, for the purposes of the trial court's determination of fees, whether the preferred stockholders were being deprived of any rights resulting from these provisions because of the management's desire to use the available funds for rehabilitation of a run-down railway, for dieselization and for reduction of indebtedness senior to the preferred stock and thus to improve the stature and value of the preferred stock, as contended by defendants, or whether those funds were wastefully expended and preferred dividends withheld as part of an improper effort to depress the market value of the preferred stock and to benefit the common stockholders at the expense of the preferred, as claimed by plaintiffs. Whatever the motive, whatever the intent, the fact remains that the preferred stockholders were not receiving their dividends, and

---

1. The record on file with the Clerk was offered in evidence. Counsel for defendant suggested that the admission be limited "with respect to the fees." Counsel for plaintiffs replied "that is the only issue before the court." * * * "we shall refer to it only for the purpose of determining the issue of reasonableness of fees." The court ruled: "* * * counsel is endeavoring to show what he and his firm did. * * * I don't suppose they are offered to prove the truth of what is set forth therein." Counsel for plaintiff then said: "No, Your Honor." Later certain other documents were offered as plaintiffs' counsel announced "not for the purpose of showing the verity of the exhibits but merely to show the work done."

that, by the settlement confirmed by the decree, they secured definite assurance of payment of the same from a specific part of the corporate funds in a definite manner and within definite dates.

In this situation, counsel were entitled to recover the customary reasonable charges for the services they rendered. This determination involved a complete and full exploration of what they had done. The time expended was a substantial factor. The fact that the fee was contingent in character was likewise relevant, and, finally, the benefits achieved by the settlement agreement as a result of all their labor were pertinent, relevant and material.

Defendant argues that there was duplication of services and that the court should have so found but, in view of the fact that the court found to the contrary and only a question of fact was involved in this respect, we have no right to interfere with the findings as to the time spent by respective counsel, with two exceptions. It is clear that 1,063 hours were devoted to the preparation and presentation of petitions for three different impounding orders, which the court, in the course of the proceedings, entered against the company, directing it to pay into the court funds to meet attorneys' fees to be allowed thereafter. Each of these orders was reversed by this court in Zimmerman v. Chicago, Great Western R. Co., 7 Cir., 185 F.2d 399. In our view, the time spent on these three reversed orders contributed nothing to the benefits achieved for the preferred stockholders. Furthermore, 157 hours were spent on solicitations of preferred stockholders to join in the suits. This added nothing to the value of the services rendered. We think the court clearly erroneously allowed these portions of the hours

served to be taken into consideration in fixing the amount of the fees.[2]

The question of what benefits were achieved for the preferred stockholders is not free of difficulty. We have seen that these shareholders were under their contract with the company entitled to certain preferred rights which they claimed they were not getting. As we have observed, whether plaintiffs were right in contending that the acts of defendant in this respect were legally improper or whether defendant's contention that the company exercised prudent management in proceeding as it did was correct, is immaterial. The fact remains, however, that, under the agreement, the dividends were resumed, accelerated and made more sure. The court found that the litigation was responsible for these benefits and with that determination we can not interfere, in view of the extended and substantial relevant evidence before the court, except to such extent as the record shows that the court included in its consideration improper elements. It follows then that, under the court's findings, the payment of dividends subsequent to the institution of the legal proceedings and prior to the settlement agreement aggregating $1,670,349, having been brought about by virtue of the litigation, as the court found, was realized for the benefit of the preferred stockholders. The payments in 1951 aggregating $1,784,757 were, necessarily, under the court's findings, a valuable achievement for the preferred stockholders. The total of these two recoveries is $3,455,106. The findings of the court, eliminating findings 33 to 39 inclusive, are complete justification for the conclusion that this last mentioned sum was achieved by virtue of litigation instituted by plaintiffs. Whether we would have so found is wholly immaterial.

In addition, plaintiffs take the position that the payments to be made during

2. Summary of time spent in all attorneys' services; total hours, including 21½ days additional, 7990, less hours spent on impounding orders, 1063 and hours spent on solicitation of authorizations to represent preferred shareholders 157, resulting in net total chargeable hours, 6770. Of this total chargeable time over 60% was contributed by attorneys holding positions as junior, associate, subordinate, clerk or otherwise other than as senior partner with their respective firms. The fee of $500,000 set by the lower court amounts to an hourly charge of approximately $73.85 for every lawyer associated with the case, irrespective of his standing in his firm.

1952–53 of $5 per share for preferred stock and $3.37½ on the arrearages, making a combined total of $3,066,121, should be included as funds acquired by virtue of their labor. In other words, they insist that they have recovered a total of $6,521,227 for the benefit of the preferred stockholders. The disturbing factor in determining just what monetary benefits were received lies in the fact that no fund in the ordinary meaning of the term, as used in class suits, was segregated and brought into court or delivered to the preferred stockholders. The court's findings impel us, as we have said, to approve the court's consideration of the above first mentioned items in computing values but, as to the others, the agreement really recites a promise upon the part of the company to do what it was already bound to do. However, the settlement did accelerate the payment of the arrearage dividends and assure, so far as possible, the payment of dividends in the future to the extent that 60% of the net earnings justify the same; thus the agreement added to and increased the protection of the preferred stockholders. It does not follow, however, in our opinion, that the plaintiffs can be said to have recovered dividends to accrue in 1952–53 merely because the defendant promised to pay and gave assurance it would pay the same. Plaintiffs' counsel are entitled to compensation for securing these additional safe-guards for the preferred stockholders, but the monetary value of those safe-guards, in view of the fact that the future is uncertain, can not be calculated in present day figures; it is a matter for future history. Consequently, we think it was improper to include the full amount of the payments to be made in 1952–53 as completed achievement. But we can not ignore the fact that the additional safe-guards are of substantial value and that this was a proper factor for the court to take into consideration.

■■ Of course the functions of finding the supporting facts and fixing fees are ordinarily within the discretion of the trial court; a court of appeals is loath to interfere. But it appears here that the court erroneously made findings upon questions of fact not in issue before it and that these findings entered into its determination; that a substantial part of the time which the court considered as having been consumed was expended for purposes having no part in acquisition of benefits for the preferred stockholders; and that the payments during 1952–53 were due under any circumstances and that the only gain as to them are some additional safe-guards. In view of these errors of fact, the order fixing fees was interwoven with erroneous conceptions. To the extent of those misconceptions, this court must correct the allowances. After mature consideration, we have concluded that a total allowance of $350,000 is entirely adequate and, indeed, liberal, and that, by the allowance of such sum, we have eradicated those factors erroneously considered by the court.

We think it not amiss to suggest, in passing, that we are not favorably impressed with the extreme liberality to themselves, as we have observed it in various reviews, which lawyers have too often been prone to demonstrate in applying for fees. We regret that the amounts requested too often bring to us the unwelcome aroma of the tactics of a pressure group,—a category, in which the bar, with its traditions and ideals, should be too proud to allow itself to be included. In our present-day economy, with taxing power and inflation running rampant, hand in hand, temptation comes to some to try to get more and more with which to counteract these two ravenous factors of our present-day economic life,—a course of conduct which, if permitted to thrive indefinitely, may ultimately destroy our very economic and political existence. It is no answer to the practical problem confronting each of us to say, as some seem to do, "We should have extremely high compensation because the tax collector takes most of it from us." All of us bear heavy tax burdens; they are not the load of one or of a few but of all. If our governmental representatives, our policy making bodies, deem it necessary to tax as we are taxed, in order to support and maintain our domestic and foreign commitments and to preserve our institutions, then, so long as that policy continues, it behooves each of us, in compliance with

it, to accommodate our mode of life to its exigencies. To do so may mean giving up luxuries to which we have been accustomed and entail stricter and stricter economy in our every day lives. And the necessity of observing this standard of conduct is not limited to special groups; it is the obligation of all, unwelcome and distasteful though it may be.

The significance of these remarks, extraneous though they may seem to some, is, in short, that $100 an hour for a lawyer, which was requested here, though the compensation be of contingent character, seems to us so unreasonable as to shock the judicial conscience. Even the allowance made by the trial court of approximately $74 per hour for every partner, subordinate associate or clerk engaged in this litigation is, under the circumstances of this case, substantially greater than judicial discretion, as we visualize it, can approve. Indeed, the amount to which we have reduced the fees may still seem extravagant not only to the public but to other members of the bar. However, we have arrived at the amount fixed after mature consideration of all pertinent factors, including the contingent character of the employment, the services rendered and the benefits obtained. At least we have satisfied our sense of what is right and proper.

We have examined the evidence and findings as to expenses. We think the record adequately supports the findings of the court as to expenses, including the expert's fee, and the judgment entered in pursuance thereof.

Since oral argument, the Zimmerman plaintiffs have filed a motion asking us to include in our mandate to the District Court, an allowance of interest at the statutory rate of 5% per annum on the amounts allowed by the District Court, from the date of entry of the original judgment below, to the extent they are approved by this court. Interest is allowed by Act of Congress "on any money judgment in a civil case recovered in a district court", 28 U.S. C.A. § 1961, at the legal rate of the state in which the court sits. Under Section 3 of Chapter 74 Ill.Rev.Stats.1951, a judgment bears interest at the rate of 5% from the date of entry. Under certain circumstances, Courts of Appeals may properly include directions with respect to interest. Briggs v. Penn. Railroad, 334 U.S. 304, 68 S.Ct. 1039, 92 L.Ed. 1403.

In the settlement agreement here, the railway company agreed to pay reasonable attorneys' fees. The amount due on this agreement could not be ascertained until what was "reasonable" had been determined. At the behest of plaintiffs over the objection of defendants, as to what was reasonable, the District Court fixed the fees at $500,000. This determination was erroneous. Consequently, neither the amount due for fees nor the due date of the obligation was authoritatively defined until our decision. There will be a final valid judgment only when a new one shall have been entered in conformity with our mandate.

On the other hand the reasonable expenses incurred, including the expert's fee, were defined by the District Court in specific terms which we have approved. Consequently, under the statutes mentioned, the obligation to pay interest upon this sum attached upon the entry of the District Court's judgment, which we affirm in this respect.

Accordingly we vacate the judgment of the District Court as to attorneys' fees and remand the cause with directions to enter judgment for $350,000 for such fees, in conformity with the views expressed in this opinion, to be divided amongst the several plaintiffs in the proportions designated by the District Court and indicated in this opinion. From and after the date of the entry of this judgment, interest will be awarded thereon in accordance with the statute at the rate of 5% per annum. The judgment for reasonable expenses, including the expert's fee, is affirmed with instructions to award interest thereon from the date of the original judgment at the rate of 5% per annum. Costs will be assessed as follows: one-half against appellants and one-half against appellees.