## SHIMKO et al. v. EASTERN STATES CORPORATION

[No. 45, September Term, 1958.]

*Decided December 19, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND and HORNEY, JJ., and HENRY, JR., Chief Judge of the First Judicial Circuit, specially assigned.

*Mortimer Shapiro,* with whom were *Nemerov & Shapiro, Harry O. Levin* and *Marshall A. Levin,* on the brief, for appellants.

*J. Crossan Cooper, Jr.,* with whom were *Francis D. Murnaghan, Jr., Venable, Baetjer & Howard, Horace R. Lamb* and *LeBoeuf, Lamb & Leiby,* on the brief, for appellee.

BRUNE, C. J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court No. 2 of Baltimore City, dated March 13, 1958, which denied a petition for the allowance of counsel fees to the appellants' attorneys. The petition sought to require payment thereof by the appellee.

This suit was instituted on June 17, 1955, by several holders of preferred stock of the respondent-appellee, Eastern States Corporation (Eastern), a Maryland corporation, holding in the aggregate 310 shares of Series A and 300 shares of Series B preferred stock of Eastern, to compel the application of approximately $2,000,000 undistributed income to the payment of arrears in dividends on the preferred stocks.

The bill alleged that the suit was brought by the complainants "in behalf of themselves and all other holders of the Series A $7.00 Dividend Preferred Stock and the Series B $6.00 Dividend Preferred Stock * * * of the respondent similarly situated." The holders of each Series of preferred stock are entitled to cumulative dividends thereon at their respective rates, payable quarterly, and no dividends may be paid on the common stock unless all accumulated arrearages, as well as current dividends, on the preferred stocks are paid or set apart for payment. The bill alleged arrearages in dividends on Series A of $113.35 and on Series B of $97.1572 per share.

The bill also alleged, *inter alia,* that approximately $2,000,000 of undistributed income had accumulated in the hands of Eastern, that this sum was not required by the corporation for the conduct of its business, that it would be in the best interests of Eastern and in accordance with its obligations under its charter to apply it to the payment of dividends in arrears on its preferred stock, and that failure so to apply it was unreasonable and arbitrary and constituted a breach of the fiduciary obligations of its directors. None of the directors were joined as parties.

The relief sought by the bill was as follows: (a) a mandatory injunction requiring Eastern to pay to the complainants and other holders of its preferred stocks $2,000,000 on account of preferred stock dividend arrears, (b) other and further relief; and (c) an award of reasonable counsel fees to the solicitors for the complainants, as well as their reasonable disbursements.

It is unnecessary for present purposes to review the pleadings in detail. Eastern demurred to the bill both generally and for non-joinder of its directors as parties. The trial court held the bill's allegations sufficient to charge such a breach of trust, or at least such an abuse of discretion, on the part of Eastern's directors as to call for an answer; but the court sustained the demurrer, with leave to amend, as to the non-joinder of directors. The bill was amended and Eastern again demurred. Its new demurrer included the grounds of the old; it also went to the sufficiency of the ex-

planation of the non-joinder of directors contained in the amended bill, and set forth more specifically the alleged insufficiency of the amended bill to state any grounds for relief.

The case was never tried, nor was there any hearing on the demurrer to the amended bill. On October 15, 1957, the trial court approved a stipulation agreed upon by the parties, the first paragraph of which terminated the case, so far as the merits of the controversy were concerned, by providing that Eastern's demurrer was sustained and the bill was dismissed with prejudice and without leave to amend further.

By the second paragraph of the above stipulation the court retained jurisdiction for the sole purpose of enabling counsel for the complainants to apply for a counsel fee in the case. Such application was made, and the case was heard upon affidavits by one of the complainants' counsel and by two of Eastern's directors, one of whom was also counsel for Eastern, and the other of whom was also an officer of Eastern, its Secretary and Treasurer. There was also an affidavit relating to the stockholdings of the complainants made by an official of Eastern's stock transfer agent, and there was considerable documentary evidence besides. It was stipulated between the parties that the facts set forth in the affidavits and exhibits were true, but conclusions drawn from such facts or beliefs based thereon by either party were not admitted by the other.

Eastern is a registered, non-diversified investment company under the Investment Company Act of 1940. It is a holding company and not an operating company. It was incorporated in 1925. By 1929 its issued and outstanding shares of capital stock consisted of 40,000 shares of Series A and 60,000 shares of Series B preferred stock, which constituted all of the authorized shares of each Series, and of 572,132 shares of common stock. The two Series of preferred stock ranked equally with each other, except as to dividend rates. On voluntary liquidation, the holder of each share of preferred stock was entitled to payment of $100, plus all accumulated dividends. Each preferred share was redeemable at $110, plus all accumulated dividends. No change could be made in the terms or contract rights of either

Series of preferred stock without the approval of the holders of 75% of the outstanding shares thereof.

By 1929 and until 1949 Eastern owned 1,000,000 shares of common stock of St. Regis Paper Company (St. Regis), which was Eastern's principal asset. (See *Eisler v. Eastern States Corporation,* 182 Md. 329, 35 A. 2d 118.) St. Regis' stock has continued to be Eastern's principal portfolio asset ever since, though by 1955 the number of shares had been reduced to 771,300. St. Regis ceased to pay dividends during the depression which began in 1929, with the result that Eastern ceased to pay dividends from 1931 until January 1, 1948. In 1948 Eastern paid dividends aggregating $5.65 per share on its Series A preferred stock and approximately $4.8426 per share on its Series B preferred stock. Since 1948 it has paid dividends at the full annual rates on each series of preferred stock, plus $1.75 and $1.35 per share on Series A and $1.50 and approximately $1.157 on Series B in 1955 and 1956, respectively, on account of arrearages, thus reducing dividends in arrears to the equivalent of exactly sixteen years ($112.00 per share for Series A and $96.00 per share for Series B).

Eastern's investment income since 1947 has been in excess of current dividend requirements on its preferred stocks, but accumulated dividends in arrears as of November 1, 1947, even after giving effect to the dividends payable January 1, 1948 amounted, according to Eastern's annual report for 1947, to $112.50 per share on the Series A preferred and to $96.50 per share on the Series B preferred. Directors of Eastern began a study of methods and means for adjusting the large arrears which had accumulated on its preferred stocks as early as November, 1947, when the meeting was held at which the dividends on the preferred stocks payable January 1, 1948, were authorized.

One of the major problems requiring consideration in any plan of recapitalization or readjustment to deal with these arrearages was the possible tax consequence to holders of the preferred stock, if under the plan Eastern should acquire such stock by purchase or exchange. The Board considered the problem of dealing with these arrears four times and the

stockholders once between November 19, 1947 and August 24, 1949. In March, 1949, the Board recommended, and in April, 1949, the stockholders approved an amendment to Eastern's stated investment policy, by which Eastern would no longer be committed to the retention of 1,000,000 shares of St. Regis stock. This amendment was duly filed with the Securities and Exchange Commission pursuant to the Investment Company Act. The Board and Eastern's counsel then studied alternative plans for the acquisition of Eastern's preferred stock either through purchase on tenders or through an exchange of St. Regis stock. The latter plan, with adjustments in cash, was adopted and was submitted to Eastern's preferred stockholders under date of August 30, 1949. A favorable income tax ruling as to the effect of the exchanges was obtained on September 2, 1949.

This exchange plan was unsuccessfully attacked by a holder of common and preferred stock of Eastern in a suit which was filed in the Circuit Court No. 2 of Baltimore City and was removed to the United States District Court. See *Brown v. Eastern States Corporation,* 86 F. Supp. 887, affirmed, 181 F. 2d 26 (C. A., 4th). The District Court found against the contentions of the attacking stockholder. The Court of Appeals found it unnecessary to pass on those contentions and questions. Because the plan had expired by its own terms and could not be extended as originally proposed and the objecting stockholder had not been injured by its operation, he was held to have no standing to attack it, whatever might be its objectionable features. Evidently, the Court of Appeals thought it would otherwise have been open to serious criticism.

The result of the exchange offer was that Eastern acquired 9,006 of its outstanding 40,000 shares of Series A preferred stock and 18,458 shares of its outstanding 60,000 shares of Series B.

Further plans were developed and action taken to work out a plan for the reorganization of Eastern. A committee of the Board to study the matter was appointed later in 1951. In 1952, the shares acquired under the 1949 exchange offer were eliminated as authorized shares. In April, 1953, a further

plan for reorganization was submitted to the Board, but it was decided to defer action.

In January, 1955, a committee of the Board previously appointed submitted a plan of recapitalization, and at the March, 1955 meeting a plan was approved by the Board "to give effect to the adjustment and discharge of arrears of dividends on outstanding preferred * * * stock." This plan proposed, in brief, the reclassification of the outstanding preferred stocks, at different rates because of the difference in dividends in arrears thereon, into a new class of convertible preferred stock. This plan required the affirmative vote of the holders of 75% of the outstanding preferred stock.

At this point, the complainants in the present suit first appeared as active participants in Eastern's affairs. They constituted themselves as a protective committee for Eastern's preferred stockholders and employed as their counsel Messrs. Nemerov & Shapiro, of New York, who, together with Messrs. Harry O. Levin and Marshall A. Levin, of Baltimore, represented the complainants both in that matter and in this case. The committee filed a bill in a suit entitled *"Crosby v. Eastern States Corporation"*, in the Circuit Court No. 2 of Baltimore City, alleging that the plan was unfair to the preferred stockholders and seeking a temporary and a permanent injunction against carrying the plan into effect. They also sought a decree requiring Eastern to pay to its preferred stockholders on account of dividend arrears cash and cash equivalents, said to amount to $2,000,000, which were not required for the normal conduct of Eastern's business. A temporary restraining order was issued. Eastern's annual meeting of stockholders was convened on April 13, 1955, but was adjourned to May 11, 1955. No vote on the plan was taken at the first meeting, at which time the management held proxies for about 54.7% of the preferred stock. During the interval the Crosby group solicited proxies in opposition to the management's plan. At the second meeting only 74% of the preferred stock was represented. 48.1% voted for the plan; 25.9% voted against it.

After the issuance of the restraining order of the Circuit

Court No. 2, the *Crosby* case was removed by Eastern to the United States District Court for the District of Maryland. Eastern answered the complaint, but no hearing was held. After the May 11th meeting the 1955 recapitalization plan was a dead issue, but the issue raised in that case with regard to applying available funds to the payment of arrears of dividends would appear to have remained open.

In the proxy soliciting material used by the complainants in the recapitalization controversy, reference was made to the *Crosby* suit as seeking, among other things, to restrain consummation of the refunding plan; and it was stated that the Committee's counsel, accountants and experts would not look to the stockholders for payment for their services beyond any sums voluntarily contributed for such purposes, and that they "have agreed to seek or apply for any additional compensation to which they may be entitled either to the Company directly or to a Court, Governmental Agency or Commission having appropriate jurisdiction for allowance of the same." No application appears to have been made to the District Court for the allowance of any counsel fee to counsel for the complainants. On the contrary, a stipulation was filed in that case on June 17, 1955, stating that "this action may be discontinued without costs to either party against the other and that an order to the foregoing effect may be entered herein without further notice." On this stipulation the suit was dismissed on the same day by a succinct order signed by Judge Thomsen reading "So ordered."

This disposition of that case, we think, may well have amounted to a waiver or abandonment of any claim for counsel fees in connection with efforts to block Eastern's recapitalization plan, particularly in view of the statements relating thereto made in the proxy-soliciting material. In the view which we take of the present case, it is, however, unnecessary to decide that question.

The present suit *(Shimko v. Eastern States Corporation)* was instituted on the same day when the *Crosby* case was dismissed. It sought, as the *Crosby* case sought in part, to require the application of available funds to the payment in part of dividends in arrears on the preferred stocks of East-

ern. Eastern did not follow that course of action or anything closely resembling it, but pursued quite a different course.

After the failure of the 1955 recapitalization plan, Eastern still sought a solution which would avoid the tax burden which the mere part payment of dividends in arrears might impose on its preferred stockholders, and sought to lighten the stockholders' tax burden by working out some plan which would result in realization of capital gain or loss to those stockholders, rather than the receipt of ordinary income.

In March, 1956, the Board proposed and the stockholders in April approved Eastern's borrowing up to $15,000,000 for the purpose of redeeming outstanding preferred stock. Changes in the money market and the unwillingness of the Commissioner of Internal Revenue to give a favorable tax ruling in advance of the proposed transaction caused this plan to be dropped.

In July, 1956, the directors of Eastern, after exploring the proposal both from a tax point of view and from the point of view of the Investment Company Act and ascertaining that a favorable ruling could be obtained as to the first and that no objection would be interposed as to the second by the staff of the Securities and Exchange Commission, adopted resolutions authorizing the expenditure of not more than $2,000,000 to purchase shares of its two series of preferred stock on the American Stock Exchange (where these stocks were listed) at prices which would cover the amounts payable thereon upon voluntary liquidation—$100 per share, plus $112 representing accrued dividends in arrears for Series A, and $100 per share, plus $96 representing accrued dividends in arrears for Series B. Because shares were found to be available under selling orders on the Exchange, Eastern's orders could not be executed at the proposed prices under the rules of the Exchange. Also, the staff of the Securities and Exchange Commission had indicated that the Commission would be opposed to Eastern's purchasing its shares at less than their liquidating values. Consequently, that purchase plan was abandoned.

On October 29, 1956, Eastern adopted a new plan and sent notices thereof to its preferred stockholders. This was, in

substance, to substitute purchases upon tenders for the previously proposed purchases on the American Stock Exchange. A favorable tax ruling on this plan was obtained. Eastern expended approximately the full sum of $2,000,000 to purchase a total of 4,205 shares of Series A and 5,655 shares of Series B preferred stock. A much greater number of shares (86% of the total outstanding) were tendered in response to this offer.

A similar call for tenders was issued in 1957, for which Eastern had available and expended approximately $1,000,000. 80% of the preferred stock was tendered. 2,031 shares of Series A and 2,905 shares of Series B preferred stock were purchased and retired.

The complainants make much of the fact that counsel for Eastern telephoned one of the counsel for the complainants in 1956 to ascertain whether his clients would oppose a plan to purchase preferred stock on the American Stock Exchange or on tenders, and that complainant's counsel, after consulting his clients, advised Eastern's counsel that they would not oppose such a plan. We think these facts do not aid the complainants. It is apparent that these plans were developed by Eastern without any suggestion from the complainants that they be adopted, and it is also apparent that neither of these plans even approximated what the complainants were seeking by their suit.

From this full recital of the facts we think it clear that neither the complainants nor their counsel contributed to the formulation or execution of the plans to use available funds to purchase and retire outstanding preferred stock of Eastern. The most that they can be said to have accomplished was to help to block a totally different plan—the abortive recapitalization plan of 1955—which seemed doomed to failure even before they whittled down management's inadequate proxy support. The plan which the complainants advocated was radically different from the plan finally adopted.

The case has been fully and ably presented as to the various questions of law involved and the different rules of law which the respective parties assert to be correct. *Harris v. Chicago Great Western Ry. Co.,* 197 F. 2d 829 (C. A., 7th), *Kroese*

*v. General Steel Castings Corp.,* 179 F. 2d 760 (C. A., 3rd), and *Gordon v. Elliman,* 306 N. Y. 456, 119 N. E. 2d 331, seem to be the cases most heavily relied upon by the complainants, and *Knapp v. Bankers Securities Corporation,* 230 F. 2d 717 (C. A., 3rd) seems to be that most heavily relied upon by Eastern. Whether this suit should be regarded as a derivative suit or as a representative suit, and whether counsel for the complainants in a suit such as this would be entitled to compensation as much as in the case of an undoubtedly derivative suit in which their efforts resulted in benefit to the corporation, are questions which we need not decide. Under any possible applicable rule of law which has been urged upon us, we think it essential that the efforts of counsel shall have contributed to the beneficial result for which they seek compensation. There was no contract in this case under which Eastern agreed to pay the complainants' counsel fees, and, as we understand the position of the complainants' counsel, they do not contend that such a contract would be valid unless they had contributed to a result beneficial to the corporation.

The trial court found that the complainants and their counsel did not contribute to the result here accomplished—the application of Eastern's funds to the purchase on tenders of its preferred stocks at prices equivalent to their asset preference upon voluntary liquidation. We think that this finding of the trial court was fully supported. Accordingly the decree dismissing the petition for a counsel fee to the complainants' solicitors is affirmed.

*Decree affirmed, with costs.*