**The WILDERNESS SOCIETY et al.,**
**Appellants,**

**v.**

**Rogers C. B. MORTON, Secretary of the Interior, et al.**

**Nos. 72–1796 to 72–1798.**

United States Court of Appeals,
District of Columbia Circuit.

Argued July 11, 1973.

Decided April 4, 1974.

As Amended June 12, 1974.

---

Dennis M. Flannery, Washington, D. C., argued in support of the bill of costs for appellants The Wilderness Society *et al.* John F. Dienelt, Washington, D. C., was also on the memorandum in support of the bill of costs.

Herbert Pittle, Atty., Dept. of Justice, argued in opposition to the bills of costs for federal appellees. Edmund B. Clark, Atty., Dept. of Justice, was on the memorandum in opposition to the bills of costs for federal appellees.

Robert E. Jordan, III, Washington, D. C., argued in opposition to the bills of costs for appellee Alyeska Pipeline Service Co. Paul F. Mickey, Washington, D. C., was also on the memorandum in opposition to the bills of costs.

Theodore L. Garrett, Washington, D. C., argued in opposition to the bills of costs for appellee State of Alaska. William H. Allen and Richard D. Copaken, Washington, D. C., were on the memorandum in opposition to the bills of costs.

Thomas F. Hogan, Rockville, Md., was on the memorandum in support of the bill of costs for appellant The Cordova District Fisheries Union.

Before BAZELON, Chief Judge, and WRIGHT, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting *en banc*.

J. SKELLY WRIGHT, Circuit Judge:

■■ Appellants Wilderness Society, Environmental Defense Fund, Inc. and Friends of the Earth request an award of expenses and attorneys' fees related to the litigation they successfully prosecuted to. bar construction of the trans-Alaska pipeline. *See* Wilderness Society v. Morton, 156 U.S.App.D.C. 121, 479 F. 2d 842, *cert. denied*, 411 U.S. 917, 93 S. Ct. 1550, 36 L.Ed.2d 309 (1973). A bill of costs has also been filed by The Cordova District Fisheries Union, appellant in No. 72–1798. While the primary issue now before us concerns the propriety of assessing attorneys' fees against appellee Alyeska Pipeline Service Company, Alyeska has also raised objections to certain expenses in the bill of costs. We agree with the Government, however, that all expenses requested by Wilderness Society *et al.* are proper, *see* 28 U.S.C. § 1920 (1970); Ex parte Peterson, 253 U.S. 300, 318, 40 S.Ct. 543, 64 L.Ed. 919 (1920) (Brandeis, J.), and should be divided equally among Alyeska, the State of Alaska, and the United States. As it was not a prevailing party on any issue in its separate suit, Cordova is not entitled to costs. *See* 28 U. S.C. § 2412 (1970). *Cf.* Rule 54(d), Fed.R.Civ.P. With respect to the main issue posed, we hold that an award of attorneys' fees is appropriate and remand the case to the District Court to determine the fees.

I

■ There have always existed equitable exceptions to the traditional Amer-

ican rule barring recovery of attorneys' fees by a successful litigant. In cases in which a party has acted in bad faith, assessment of fees properly serves to punish that party's obdurate behavior. *See* Hall v. Cole, 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). Another exception includes cases in which the plaintiff's suit confers a benefit on the members of an ascertainable class and in which an award of fees will serve to spread the costs of litigation among its beneficiaries. *See* Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

■ Neither of these historic exceptions is applicable here. Appellees' legal position as to the meaning of the Mineral Leasing Act and relevant administrative regulations, though ultimately rejected by the court, was manifestly reasonable and assumed in good faith, particularly in view of the long administrative practice supporting it. *See* Wilderness Society v. Morton, *supra,* 156 U.S. App.D.C. at 143–149, 479 F.2d at 864–870. And although the "common benefit" exception has been given expanded scope in recent cases, *compare* Hall v. Cole, *supra, with* Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), we would have to stretch it totally outside its basic rationale to apply it here. As is discussed more fully below, this litigation may well have provided substantial benefits to particular individuals and, indeed, to every citizen's interest in the proper functioning of our system of government. But imposing attorneys' fees on Alyeska will not operate to spread the costs of litigation proportionately among these beneficiaries, the key requirement of the "common benefit" theory. *See* Bangor & Aroostook R. Co. v. Brhd of Loc. Firemen & Enginemen, 143 U.S. App.D.C. 90, 101, 442 F.2d 812, 823 (1971).

The Supreme Court has recently indicated, however, that the equitable power of federal courts to award attorneys' fees when the interests of justice so require is not a narrow power confined to rigid sets of cases. Rather, it " 'is part of the original authority of the chancellor to do equity in a particular situation,' " Hall v. Cole, *supra,* 412 U.S. at 5, 93 S.Ct. at 1746, *quoting* Sprague v. Ticonic National Bank, *supra,* 307 U.S. at 166, 59 S.Ct. 777, and should be used whenever " 'overriding considerations indicate the need for such a recovery.' " *Id., quoting* Mills v. Electric Auto-Lite Co., *supra,* 396 U.S. at 391–392, 90 S.Ct. at 625.

Recognizing their broad equitable power, some courts have concluded that the interests of justice require fee shifting in a third class of cases where the plaintiff acted as a " 'private attorney general,' vindicating a policy that Congress considered of the highest priority." Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). *See, e. g.,* Brandenburger v. Thompson, 9 Cir., 494 F.2d 885, decided March 25, 1974); Natural Resources Defense Council v. EPA, 1 Cir., 484 F.2d 1331 (1973); Cooper v. Allen, 5 Cir., 467 F.2d 836 (1972); Donahue v. Staunton, 7 Cir., 471 F.2d 475 (1972), cert. denied, 410 U.S. 955, 93 S. Ct. 1419, 35 L.Ed.2d 687 (1973); Cole v. Hall, 2 Cir., 462 F.2d 777 (1972), affirmed on alternate rationale, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); Knight v. Auciello, 1 Cir., 453 F.2d 852 (1972); Lee v. Southern Home Sites Corp., 5 Cir., 444 F.2d 143 (1971); United Steelworkers of America v. Butler Manufacturing Co., 8 Cir., 439 F.2d 1110, 1113 (1971); Sierra Club v. Lynn, W.D.Tex., 364 F.Supp. 834, 5 E.R.C. 1745 (1973); Stanford Daily v. Zurcher, N.D.Cal., 366 F.Supp. 18, 23–24 (1973); Harper v. Mayor and City Council of Baltimore, D.Md., 359 F.Supp. 1187, 1218 (1973); Calnetics Corp. v. Volkswagen of America, Inc., C.D.Cal., 353 F.Supp. 1219 (1973); La Raza Unida v. Volpe, N.D.Cal., 57 F.R.D. 94 (1972); Wyatt v. Stickney, M.D.Ala., 344 F. Supp. 387 (1972); NAACP v. Allen, M. D.Ala., 340 F.Supp. 703 (1972); Sims v. Amos, M.D.Ala., 340 F.Supp. 691 (1972); Bradley v. School Board of City

of Richmond, E.D.Va., 53 F.R.D. 28 (1971), reversed, 4 Cir., 472 F.2d 318, (1972), cert. granted, 412 U.S. 937, 93 S.Ct. 2773, 37 L.Ed.2d 396 (1973). *See also* Note, Awarding Attorney and Expert Witness Fees in Environmental Litigation, 58 Corn.L.Rev. 1222, 1237–1246 (1973).

■ While this court has not previously had occasion to focus directly on the "private attorney general" rule in attorneys' fees, it stressed the salient consideration in Freeman v. Ryan, 133 U.S.App.D.C. 1, 3, 408 F.2d 1204, 1206 (1968), when it accompanied an award of attorneys' fees with the comment:

> "Our objective is to proceed in accordance with equitable principles so as to reward the attorneys whose service in stopping an unauthorized payment has been of benefit to the class of private persons involved, and to the public interest in observance by administrative and executive officials of statutory limitations on their authority."

It is a paramount principle of equity that the court will go much farther both to grant and to withhold relief in furtherance of the public interest than when only private interests are involved. *See* Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937), where the Court added that the legislature's declaration of public interest and policy is "persuasive in inducing courts to give relief."

■ We find persuasive the arguments advanced by these courts in adopting a private attorney general exception to the traditional American rule.

> "The violation of an important public policy may involve little by way of actual damages, so far as a single individual is concerned, or little in comparison with the cost of vindication * * *. If a defendant may feel that the cost of litigation, and, particularly, that the financial circumstances of an injured party may mean that the chances of suit being brought, or continued in the face of opposition, will be small, there will be little brake upon deliberate wrongdoing. In such instances public policy may suggest an award of costs that will remove the burden from the shoulders of the plaintiff seeking to vindicate the public right. * * * *"

Knight v. Auciello, *supra*, 453 F.2d at 853. In much litigation, whether or not formally designated as a class action, a party sues not only to vindicate his own interests, which often are minor, but to enjoin injuries to a broad class—injuries which may be quite extensive when viewed collectively. *See, e. g.,* Sierra Club v. Morton, 405 U.S. 727, 736–738 & 739 n. 15, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). In such cases, "[i]f successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts." Newman v. Piggie Park Enterprises, Inc., *supra*, 390 U.S. at 402, 88 S.Ct. at 966. When violation of a congressional enactment has caused little injury to any one individual, but great harm to important public interests when viewed from the perspective of the broad class intended to be protected by that statute, not to award counsel fees can seriously frustrate the purposes of Congress. *See* Hall v. Cole, *supra*, 412 U.S. at 13–14, 93 S.Ct. 1943. Where the law relies on private suits to effectuate congressional policy in favor of broad public interests, attorneys' fees are often necessary to ensure that private litigants will initiate such suits. *See* Lee v. Southern Home Sites Corp., *supra*, 444 F.2d at 145. Substantial benefits to the general public should not depend upon the financial status of the individual volunteering to serve as plaintiff or upon the charity of public-minded lawyers. *See* Donahue v. Staunton, *supra*, 471 F.2d at 483; Lâ Raza Unida v. Volpe, *supra*, 57 F.R.D. at 101 & n. 10.

Despite the growing trend to recognize these considerations, at least one court has been reluctant to award attorneys' fees under a private attorney general theory, reflecting concern that the exception would swallow up the general rule and result in awarding fees to successful parties in all statutory causes of action. *See* Bradley v. School Board of City of Richmond, 4 Cir., 472 F.2d 318, 329–331 (1972), cert. granted, 412 U.S. 937, 93 S.Ct. 2773, 37 L.Ed.2d 396 (1973). *Cf.* Note, The Allocation of Attorney's Fees After Mills v. Electric Auto-Lite Co., 38 U.Chi.L.Rev. 316, 328–336 (1971). Such fears are not lightly to be disregarded, for the American rule barring attorneys' fees to successful litigants except in extraordinary circumstances is based on important policies of its own. But if the matter is examined closely, it becomes evident that the private attorney general exception, at least as applied to the factual circumstances of the present case, is not inconsistent with the policies behind the traditional American rule. To the contrary, an award of fees in the present case may be justified by reference to the very same policies.

## II

The chief rationale behind the American rule is the notion that parties might be unjustly discouraged from instituting or defending actions to vindicate their rights if the penalty for losing in court included the fees of their opponent's counsel.[1] *See* Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); McCormick, Counsel Fees and Other Expenses of Litigation as an Element of Damages, 15 Minn.L.Rev. 619, 639–642 (1931). The possibility of unjust deterrence of litigation is most often stated from the plaintiff's point of view. An individual with a relatively small damage claim, for example, could easily be discouraged from pressing that claim in court, no matter how meritorious he in good faith believed it to be, if losing the lawsuit meant paying the defendant's attorney's fees which might approach or even exceed the value of his claim. *Cf.* Farmer v. Arabian American

---

1. Another rationale for the American rule is that "the time, expense, and difficulties of proof inherent in litigating the question of what constitutes reasonable attorney's fees would pose substantial burdens for judicial administration." Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967). *See also* Oelrichs v. Spain, 82 U.S. (15 Wall.) 211, 231, 21 L.Ed. 43 (1872):

"* * * There is no fixed standard by which the *honorarium* can be measured. Some counsel demand much more than others. Some clients are willing to pay more than others. More counsel may be employed than are necessary. When both client and counsel know that the fees are to be paid by the other party there is danger of abuse. A reference to a master, or an issue to a jury, might be necessary to ascertain the proper amount, and this grafted litigation might possibly be more animated and protracted than that in the original cause. It would be an office of some delicacy on the part of the court to scale down the charges, as might sometimes be necessary."

We think, however, that actual experience is a more trustworthy guide than fears expressed over 100 years ago as to what might come to pass if fees were awardable. Courts have shown themselves quite able to develop reasonable and workable standards for setting attorneys' fees. *See* text at pp. 1036–1037 *infra*. Litigation over the amount of fees can hardly be said to be burdensome. Indeed, parties are often able to agree on a reasonable fee. *See, e. g.,* Sims v. Amos, M.D.Ala., 340 F.Supp. 691, 693 n. 3 (1972). Nor has it proved particularly delicate for courts to scale down unreasonable fee requests. *See, e. g.,* Bates v. Hinds, N.D.Tex., 334 F.Supp. 528, 533 (1971). The apparent ease with which the courts have handled the numerous cases in which fees have been granted, either under statutes expressly authorizing recovery of fees such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(k) (1970), or under traditional equitable exceptions, undercuts the dire predictions that determination of appropriate fees will unduly burden the courts. *See, e. g.* Robinson v. Lorillard Corp., 4 Cir., 444 F.2d 791 (1971); Culpepper v. Reynolds Metals Co., 5 Cir., 442 F.2d 1078 (1971); Lea v. Cone Mills Corp., 4 Cir., 438 F.2d 86 (1971); Parham v. Southwestern Bell Telephone Co., 8 Cir., 433 F.2d 421 (1970).

Oil Co., 379 U.S. 227, 235, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964); *id.* at 236–239, 85 S.Ct. 411 (Mr. Justice Goldberg, concurring). *But see* Ehrenzweig, Reimbursement of Counsel Fees and the Great Society, 54 Calif.L.Rev. 792 (1966). Of course, the argument has equal merit from the defendant's point of view. A defendant faced with a relatively small claim might well be induced to capitulate to the plaintiff's demands, even though he legitimately felt he had a good defense, if losing the case in court would mean paying the plaintiff's attorney's fees. *See* McCormick, *supra,* 15 Minn.L.Rev. at 641. Simply stated, then, imposition of attorneys' fees on the losing party is thought to raise the stakes of litigation and thereby to discourage individuals from submitting their rights to judicial determination.

Whatever force this argument concededly has in the great run of civil litigation, we think it plainly inapposite to the circumstances of the present case. As Alyeska has so often brought to our attention, the value of its investment at stake in this litigation was over a billion dollars. Each week's delay in constructing the pipeline imposed an additional $3.5 million in costs. Any award of fees in this case, though conceivably large in absolute sense, will be paltry in comparison with the interest Alyeska had in defending this appeal. Where the interest at stake is many times greater than the expected cost of one's opponent's attorney's fees, any possibility of deterrence is surely remote if not nonexistent.[2] *Cf.* Note, Attorney's Fees: Where Shall the Ultimate Burden Lie?, 20 Vand.L.Rev. 1216, 1222–1223 & 1230 (1967).

Looking at this case from appellants' point of view, the unavailability of attorneys' fees might significantly deter them from having brought this meritorious litigation. In prosecuting this case, appellants undertook litigation of monumental proportions. According to their bill of costs, the matters appealed consumed over 4,500 hours of lawyers' time, all in addition to the efforts before the District Court in 1970 when this action was commenced and preliminary injunctive relief obtained. *See* Wilderness Society v. Hickel, D.D.C., 325 F.Supp. 422 (1970). This burden was assumed not in the hope of obtaining a monetary award, nor to protect an interest peculiar to appellants and their members, but rather to vindicate important statutory rights of all citizens whose interests might be affected by construction of the pipeline.

Whether we consider the Mineral Leasing Act and administrative regulation issues upon which the court rested its opinion declaring the pipeline unlawful, or the National Environmental Policy Act (NEPA) issues which the court left undecided, appellants succeeded in their role as private attorneys general protecting vital statutory interests.

It is argued that the width limitation in Section 28 of the Mineral Leasing Act of 1920 does not amount to a congressional policy of preeminent importance. But the dispute in this case was more than a debate over interpretation of that Act. Appellees' primary argument was

2. Had appellees been the prevailing parties and sought attorneys' fees from appellants, the possibility of deterrence would be significant and the rationale of the American rule would therefore bar recovery of fees. In this sense there is an admitted lack of reciprocity in granting attorneys' fees under a private attorney general theory. The same lack of reciprocity, however, appears to be present in so-called "common benefit" cases. In Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), for example, the successful plaintiff in a suit brought under § 102 of the Labor-Management Reporting & Disclosure Act of 1959 was awarded fees from the defendant union on the ground the suit benefitted all union members and reimbursement of attorneys' fees out of the union treasury would shift the costs of litigation to these beneficiaries. 412 U.S. at 7–8, 93 S.Ct. 1943. Had the defendant union prevailed on the merits, however, it is doubtful that the same theory would have required awarding fees to defendant because of the risk of deterring plaintiffs from bringing suit.

that, whatever the width restrictions in the Act originally meant, a settled administrative practice to evade those restrictions took precedence. In the final analysis, this case involved the duty of the Executive Branch to observe the restrictions imposed by the Legislative, *see* Freeman v. Ryan, 133 U.S.App.D.C. 1, 3, 408 F.2d 1204, 1206 (1968), and the primary responsibility of the Congress under the Constitution to regulate the use of public lands. Wilderness Society v. Morton, *supra,* 156 U.S.App.D.C. at 170–172, 479 F.2d at 891–893.

The proper functioning of our system of government under the Constitution is, of course, important to every American, and in this sense appellants' suit had great therapeutic value. *Cf.* Mills v. Electric Auto-Lite Co., *supra,* 396 U.S. at 396, 90 S.Ct. 616. But requiring the Congress to revise the Mineral Leasing Act rather than permitting continued evasion of its clear, though anachronistic, restrictions has had other more concrete and equally important benefits. As a result of this suit, Congress has amended the Mineral Leasing Act to remove the restrictions of the 1920 statute and permit construction of the trans-

Alaska pipeline. Public Law 93–153, 93rd Cong., 1st Sess. (November 16, 1973). The statute imposes several important new requirements designed to protect the public interest. Rather than continue the prior practice of permitting free use of Government land, the new statute requires the issuing agency to receive the "fair market value" of the right-of-way and empowers the agency to assess against the right-of-way recipient all reasonable administrative costs of processing an application and monitoring the right of way. Pub.L. 93–153, § 101 (amending Mineral Leasing Act of 1920, § 28($l$)). The statute contains special provisions making the operator of the pipeline strictly liable for damages resulting from use of the right-of-way, *id.,* § 204. The same section of the new statute requires the operator to maintain a $100,000,000 liability fund to satisfy the claims, *id.,* § 204(c)(5). Forcing Alyeska to go to Congress to amend the 1920 Act certainly was not a sterile exercise in legal technicalities devoid of public significance.

The equities in favor of awarding fees for appellants' efforts on NEPA issues are just as compelling.[3] Elaborate spe-

3. The environmental benefit from this litigation is generously recognized by the Honorable Russell E. Train, then chairman of the President's Council on Environmental Quality and now Administrator of the Environmental Protection Agency, before the Joint Judicial Conference of the Eighth and Tenth Circuits on June 29, 1973:

"The Alaska Pipeline may not have been a tidy example of the judicial process, but it has been an excellent example where NEPA and the courts have forced the reconciliation of environmental concerns with sound engineering practices on a major energy project. The President has now called for construction of the pipeline at the earliest possible date, and the Administration has introduced legislation which would remove the present right-of-way restrictions and is urging swift action on the bill.

"To some any delay in the completion of the pipeline is unreasonable. In reality, though, much of the delay has been beneficial. The problems of constructing a hot oil pipeline across permafrost are very real. The problems of constructing a

pipeline across one of the most seismically active and remote areas of the world are likewise very real. These and other significant problems were simply not adequately faced in the initial proposal presented to the Department of the Interior in 1969.

"If the pipeline had been constructed using the original design specifications, it would very likely have resulted in not only very serious environmental damage but also serious operational problems. Indeed, the physical integrity of the pipeline itself was very much at stake.

"Thus, the case of the Alaska pipeline has not been simply one of aesthetics, or of concern over wildlife and wilderness disturbance, or worries over water pollution, important as all of these are. It was clearly an example where sound environmental analysis was essential to sound engineering and siting.

"In all honesty, the process has been one of learning for both industry and government. I believe that industry seriously underestimated the real technical difficulties of the task and failed to appreciate

cific procedures are provided under the 1973 amendments to ensure protection of environmental interests. *Id.,* § 101 (amending Mineral Leasing Act of 1920, § 28(h)(1) & (2)). One need not have the hindsight of history to know that the commitment to improving and protecting our natural environment is one of the most vital of current national policies. NEPA is only one part of a vast legislative effort toward that end, but it is among the most important because of its broad scope. *See generally* Scientists' Institute for Public Information v. AEC, 156 U.S.App.D.C. 395, 402–405, 481 F.2d 1079, 1086–1089 (1973). And effective pursuit of congressional policy under NEPA, as with much legislation in the environmental area, depends on the diligence of private attorneys general and their willingness to bring suit to further broad public interests.[4]

■ Nor do we think it of controlling importance that this court did not actually decide the NEPA issues and that Congress has subsequently decided in the pipeline legislation that the impact statement prepared by the Department of the Interior shall be deemed sufficient under NEPA. *See* Pub.L. 93–153, *supra,* § 203(d). The advancement of important legislative policy justifying an award of attorneys' fees can be accomplished even where the plaintiff does not obtain the ultimate relief sought by the filing and prosecution of his suit.

*See, e. g.,* Mills v. Electric Auto-Lite Co., *supra.* Where litigation serves as a catalyst to effect change and thereby achieves a valuable public service, an award of fees may be appropriate even though the suit never proceeds to a successful conclusion on the merits. *See* Parham v. Southwestern Bell Telephone Co., 8 Cir., 433 F.2d 421 (1970). *Cf.* Gilson v. Chock Full O'Nuts Corp., 2 Cir., 331 F.2d 107 (1964) (*en banc*).

Here appellants' lawsuit and appeal served as a catalyst to ensure that the Department of the Interior drafted an impact statement and that the statement was thorough and complete. It must be recalled that when appellants commenced this suit in 1970 the Interior Department, though ready to issue the necessary rights-of-way, had not yet drafted an environmental impact statement for the pipeline. The failure to comply with NEPA was an alternative ground for the District Court's preliminary injunction. *See* Wilderness Society v. Hickel, *supra. Cf.* McEnteggart v. Cataldo, 1 Cir., 451 F.2d 1109 (1971), cert. denied, 408 U.S. 943, 92 S.Ct. 2878, 33 L.Ed.2d 767 (1972). Requiring the Department to draft an impact statement as mandated by law not only benefitted the public's statutory right to have information about the environmental consequences of the pipeline. It also led to the refinement of environmentally protective stipulations placed as conditions on the rights-of-way.[5]

---

fully—particularly at the outset—the new conditions for decision-making in matters that substantially affect the environment. On its part, government was ill-equipped both institutionally and informationally for dealing with the complex problems of the pipeline. Few would now contend that the Interior Department's first response to NEPA on the pipeline right-of-way application was really adequate."

4. *See, e. g.,* Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (Department of Transportation Act and Federal-Aid Highway Act); Natural Resources Defense Council, Inc. v. EPA, 1 Cir., 484 F.2d 1331 (1973) (Clean Air Amendments of 1970); Scientists' Institute for Public Information

v. AEC, 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973) (NEPA); Natural Resources Defense Council, Inc. v. Morton, 148 U.S. App.D.C. 5, 458 F.2d 827 (1972) (NEPA); Calvert Cliffs' Coordinating Committee v. USAEC, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971) (NEPA); Environmental Defense Fund v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584 (1971) (Federal Insecticide, Fungicide, & Rodenticide Act); Sierra Club v. Lynn, W.D.Tex., 364 F.Supp. 834, 5 E.R. C. 1745 (1973) (NEPA).

5. *See* United States Department of the Interior, Final Environmental Impact Statement: Proposed Trans-Alaska Pipeline, Vol. I, App. (1972). Under the 1973 amendments to the Mineral Leasing Act of 1920, the right-of-way for the trans-Alaska pipeline is

Although Congress has now given the go-ahead to the pipeline on the basis of the impact statement prepared by the Department, this appeal helped focus attention in Congress on the major issue raised—the relative merits of a trans-Canadian *versus* a trans-Alaskan route.[6] *See, e. g.,* 119 Cong.Rec. S12795–S12803 (daily ed., July 9, 1973). *See also* Title III of Pub.L. 93–153, *supra.* We take the action of Congress approving the impact statement, not as a total rejection of the arguments made on appeal, but rather as a recognition that appellants had raised a very substantial question which the courts were likely to require considerable time to resolve and that, time being of the essence in providing for delivery of North Slope oil, a congressional resolution was required.[7]

We also deem it significant that the Mineral Leasing Act issues on which appellants clearly prevailed were somewhat interrelated with the NEPA issues. It required a precise analysis of the exact impact of the pipeline as explicated in the impact statement in order to pass on the Government's claim that the special land use permit involved only a revocable license rather than a permanent right-of-way. *See* Wilderness Society v. Morton, *supra,* 156 U.S.App.D.C. at 152–154, 479 F.2d at 873–875. In addition, we note that after it became clear that the Interior Department would persist in issuing the right-of-way despite the District Court's initial decision that the right-of-way violated the Mineral Leasing Act, appellants sought summary judgment on the Mineral Leasing Act issue alone so that this matter could be resolved by the courts without wading into the more factually complex NEPA issues. Summary judgment was opposed by appellees, and appellants were thus forced to brief and argue an issue which, because of their very success on the Mineral Leasing Act issue, never became ripe for adjudication. *Compare* Switzer Bros., Inc. v. Chicago Cardboard Co., 7 Cir., 252 F.2d 407 (1958). Taking into account all these factors, we

expressly made subject to the terms and conditions of these stipulations. *See* Pub.L. 93–153, 93d Cong., 1st Sess. (Nov. 16, 1973), § 203(c). It is also interesting to note that many of those in Congress supporting immediate construction of the trans-Alaska pipeline did so because "the environmentalists—through long delays they already have forced—achieved the inclusion of strong safeguards in plans for the Alaskan line." 119 Cong.Rec. S13574 (daily ed., July 16, 1973) (Senator Fannin).

6. Senator Peter Dominick of Colorado and his former legislative assistant, David Brody, refer to our original decision in this case as a "remand" to the Congress to consider, not only the amendment of the Mineral Leasing Act of 1920, but the environmental issue as well. The action of Congress in amending the Act and resolving the environmental issue resulted in the voluntary dismissal of this entire litigation on January 16, 1974.

"Whatever the shortcomings in having the courts decide major issues on rather narrow bases, such disadvantages are outweighed by the result of transferring the controversy to the proper forum—the legislature. The goal of increasing public participation in environmental decision-making is furthered by the remand disposition. Normally, this disclosure function is accomplished in the administrative process under NEPA; information disclosed in impact statements may provoke public entry into bureaucratic decision-making.[61] The process of remand further provokes public involvement, and encourages the Congress to employ a national perspective and thus concern itself with the broad issues involved. * * *"

Dominick & Brody, The Alaska Pipeline: *Wilderness Society v. Morton* and the Trans-Alaska Pipeline Authorization Act, 23 Amer.U.L.Rev. 337, 352–353 (1973). In note 61 the authors cite Natural Resources Defense Council, Inc. v. Morton, 148 U.S. App.D.C. 5, 11, 458 F.2d 827, 833 (1972), where we developed the need for a full impact statement for the purpose of informing the legislature and the public—not merely higher-ups in the chain of executive command.

7. Senator Gravel, the author of the amendment which provided that actions already taken by the Department of the Interior shall be deemed sufficient compliance with NEPA, argued that were his amendment defeated "we would see ourselves languishing in court for a year to 2 years * * *." 119 Cong.Rec. S13571 (daily ed., July 16, 1973). *See also id.* at S13574 (Senator Fannin); *id.* at S13684 (July 17, 1973) (Senator Fannin).

think the equities favor awarding fees for appellants' efforts on the NEPA issues even though the court rendered no judgment on these matters.

■ In sum, the equities of this particular case support an award of attorneys' fees to the successful plaintiffs-appellants. Acting as private attorneys general, not only have they ensured the proper functioning of our system of government, but they have advanced and protected in a very concrete manner substantial public interests. An award of fees would not have unjustly discouraged appellee Alyeska from defending its case in court. And denying fees might well have deterred appellants from undertaking the heavy burden of this litigation.

### III

Even if fees are to be awarded under a private attorney general theory, a question is posed as to whether Alyeska should bear them. Technically, it is the Interior Department, on Alyeska's application, which violated the Mineral Leasing Act by granting rights-of-way in excess of the Act's width restrictions, and it is the Interior Department's failure to comply with NEPA which was challenged on appeal. Under 28 U.S.C. § 2412, however, no attorneys' fees can be imposed against the United States. Alyeska argues that it is inappropriate to circumvent the statute by taxing it for a dereliction not its own.

■ Fee shifting under the private attorney general theory, however, is not intended to punish law violators, but rather to ensure that those who have acted to protect the public interest will not be forced to shoulder the entire cost of litigation. Cf. Hall v. Cole, *supra* 412 U.S. at 14, 93 S.Ct. 1943. After successfully persuading the Interior Department to grant the rights-of-way, Alyeska intervened in this litigation to protect its massive interests. Since Alyeska unquestionably was a major and real party at interest in this case, actively participating in the litigation along with the Government, we think it fair that it should bear part of the attorneys' fees.[8] Cf. Silva v. Romney, 1 Cir., 473 F.2d 287 (1973). In recognition of the Government's role in the case, on the other hand, Alyeska should have to bear only half of the total fees. The other half is properly allocated to the Government and, because of the statutory bar, must be assumed by appellants. In this manner the equitable principle that appellees bear their fair share of this litigation's full cost and the congressional policy that the United States not be taxable for fees can be accommodated.

■ Because assessment of fees, even for services on appeal, involves factual questions, the amount of an award should as a general rule be fixed in the first instance by the District Court, after hearing evidence if necessary as to the extent and nature of the services rendered. See Perkins v. Standard Oil Co. of California, 399 U.S. 222, 90 S.Ct. 1989, 26 L.Ed.2d 534 (1970); United Pacific Insurance Co. v. Idaho First National Bank, 9 Cir., 378 F.2d 62, 69 (1967). We observe that procedure here, with only the following limited guidance as to the standard to be applied by the District Court in determining the fee. The fee should represent the reasonable value of the services rendered, taking into account all the surrounding circumstances, including, but not limited to, the time and labor required on the case, the benefit to the public, the skill demanded by the novelty or complexity of the issues, and the incentive factor. See generally Angoff v. Goldfine, 1 Cir., 270 F.2d 185, 188–189 (1959); Pergament v. Kaiser-Frazer Corp., 6 Cir., 224 F.2d 80, 83 (1955);

---

8. In the circumstances of this case it would be inappropriate to tax fees against appellee State of Alaska. The State voluntarily participated in this suit, in effect to present to the court a different version of the public interest implications of the trans-Alaska pipeline. Taxing attorneys' fees against Alaska would in our view undermine rather than further the goal of ensuring adequate spokesmen for public interests.

Harris v. Chicago Great Western R. Co., 7 Cir., 197 F.2d 829, 832–833 (1952). *Cf.* Bakery & Confectionery Wkrs International Union v. Ratner, 118 U.S.App. D.C. 269, 273–275, 335 F.2d 691, 695–697 (1964); Kiser v. Miller, D.D.C., 364 F. Supp. 1311 (1973).

Finally, a question is raised as to how the fees should be distributed as among appellants, the attorneys, and the organizations for which some of the attorneys are salaried employees. After determining a reasonable fee and dividing it in half, as indicated above, the District Court should ensure that the three appellant organizations are reimbursed for any payments they have already made to counsel. The first purpose of an award of fees is to make the client whole. *See* Clark v. American Marine Corp., E.D.La., 320 F.Supp. 709 (1970), *affirmed,* 5 Cir., 437 F.2d 959 (1971); United States v. State Farm Mutual Automobile Insurance Co., D. Or., 245 F.Supp. 58 (1965).

The fee award need not be limited, however, to the amount actually paid or owed by appellants. It may well be that counsel serve organizations like appellants for compensation below that obtainable in the market because they believe the organizations further a public interest. Litigation of this sort should not have to rely on the charity of counsel any more than it should rely on the charity of parties volunteering to serve as private attorneys general. The attorneys who worked on this case should be reimbursed the reasonable value of their services, despite the absence of any obligation on the part of appellants to pay attorneys' fees. *See* Miller v. Amusement Enterprises, Inc., 5 Cir., 426 F.2d 534 (1970); Clark v. American Marine Corp., *supra,* 320 F.Supp. at 711.

It is our view that the award must go to counsel rather than to the organizations which pay their salaries. This is sound, whether such organization is a litigating party or a public interest law firm or defense fund. This procedure avoids all problems of whether the organization might, by receiving an award directly, be involved in the unauthorized practice of law. On the other hand, the equitable foundation of the award of counsel fees persists after the award to require the counsel to reimburse their respective organizations for the kinds of expenses they incurred which would normally be included in an attorney's fee— compensation paid for the services of attorneys and their adjunct staffs, *e. g.,* legal stenographers, and for the supplies and services required by the attorneys in order that they might render their legal services. This procedure will operate equitably, both to prevent loss to the organization and to avoid double benefit to counsel. But any amount in excess of such reimbursement belongs to counsel themselves. That excess may, in whole or in part, be contributed to the organization involved, or to like causes, or retained by counsel, and we revert to the possibility that the salary they previously received represented less than they could have earned on the market in the absence of their dedication to the public interest.[9]

9. In his dissent Judge Wilkey quotes from a memorandum and several affidavits submitted to the District Court on July 19, 1971 by plaintiffs (appellants here) and their Washington, D. C. lawyers in opposition to the defendant Secretary's motion for change of venue to Alaska. These documents contain representations that plaintiffs could not afford to pay attorneys' fees, that plaintiffs' Washington lawyers were serving without fee, and that these lawyers were unable to self-finance the conduct of extensive litigation in Alaska. The dissent suggests that plaintiffs were guilty of misrepresentation, by either commission or omission, and that this misrepresentation affected the District Judge's denial of the motion for venue change. On both counts the dissent is mistaken.

(1) There was no misrepresentation. Plaintiffs were not able to pay attorneys' fees; plaintiffs were not paying fees to their Washington lawyers; these lawyers did not have sufficient funds of their own to carry on this complex case in Alaska. At no point did plaintiffs or their lawyers state, hint, or imply that they would abstain from seeking an award of fees. In fact there is

no evidence and no reason to believe that plaintiffs had, by July of 1971, given any thought whatever to the possibility of a fee award. Plaintiffs could not have known then that they would win their case in such a way as to justify an award. In July of 1971 no circuit had yet ruled that such an award was proper on behalf of "private attorney general" litigants in environmental suits successfully prosecuted in the public interest. Our circuit so rules for the first time today—in a 4 to 3 opinion. Does the dissent seriously suggest that plaintiffs had a duty to prophesy their victory, the nature of their victory, and the future development of case law concerning fee awards so that it could have "been represented to the District Court that plaintiffs' counsel would seek and be awarded * * * a fee"? We must point out that neither plaintiffs nor their counsel are soothsayers.

(2) Assuming *arguendo* that, by July 1971, plaintiffs had given thought to requesting a fee award in the event of ultimate victory, a representation to this effect would *not*, as the dissent asserts, have cast the venue issue into "a dramatically different light before the District Judge." Plaintiffs' intentions on this score could have had no bearing on the venue issue. That, we imagine, is why *no party*, including the District Judge, showed the slightest interest in plaintiffs' intentions. The dissent fashions two wonderfully ambiguous sentences to link together the fee award and venue issues:

> Plaintiffs could not have argued that they would be deprived of counsel, either those already chosen or others, by a change in venue to Alaska or any other place. The lively expectation of such fees as may now be awarded would have brought many lawyers to plaintiffs' side, either in Alaska or elsewhere.

We are constrained to remind the dissenters:

(a) Neither the plaintiffs nor anyone else could have notified the Alaska bar in July of 1971 that we would hold as we do today. For plaintiffs to have announced in July of 1971 that they might seek an award of fees in the event of ultimate victory would not have created a "lively expectation of such fees" in Alaska or anywhere else. Plaintiffs had yet to win their suit; the case law concerning fee awards had yet to mature. Plaintiffs' hopes and intentions—whatever they might have been in July 1971—were not legal tender, and would have added not one penny to plaintiffs' financial capacity to prosecute the suit here or in Alaska. The dissenters forget the chronological nature of our legal system, whereby pretrial motions typically proceed in ignorance of the ulti-

mate outcome of the litigation. Perhaps, however, the dissenters are trying to make a separate point, *i. e.* that our decision today may increase the willingness of skilled lawyers throughout the nation to undertake public interest litigation on behalf of unmonied clients with just, lawful, and important claims. This proposition we of course accept, and count it a happy result of our decision.

(b) It was *not* the Secretary's position on the motion for change of venue that plaintiffs should switch to Alaska counsel for prosecution of the suit in that state. The Secretary fully conceded that a change of counsel would be "undesirable," given the months of preparation which plaintiffs' Washington lawyers had already committed to the case. Response to Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion to Change Venue, July 27, 1971, at 8–9. Rather, the Secretary argued that the case could be resolved by plaintiffs and their Washington lawyers with "a few trips to Alaska." *Id.* This was a bizarre view of the suit's complexity, and it would hardly have been rendered realistic or plausible by a representation that plaintiffs might ultimately seek a judicial award of fees.

(c) Plaintiffs' most telling arguments on the venue question did *not* turn on the scarcity of "free" counsel in Alaska. At the crux of plaintiffs' position was a showing that it was in the District of Columbia that plaintiffs' staffs and organizations were headquartered, that all pertinent Government documents were located, that the most important expert witnesses were available, and that the case had already been litigated for 16 months with no inconvenience to the Government. In addition, plaintiffs argued extensively and persuasively that the legal issues at stake were matters not of local but of national, even international, concern. *See generally* Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion to Change Venue, July 19, 1971, and accompanying affidavits. The District Judge's ruling was phrased in commensurately broad terms, with no mention of availability of counsel. He held that

> the defendant has failed to show that the requested transfer would serve the convenience of parties and witnesses and the interest of justice.

Order of Aug. 9, 1971. In our judgment it cannot be seriously contended that this eminently sound determination could have been affected by the possibility—at that time so speculative as to seem quixotic—that attorneys' fees might ultimately be awarded in this case.

An order will enter awarding statutory costs, and the bill of costs is remanded to the District Court for the setting of attorneys' fees.

So ordered.

MacKINNON, Circuit Judge, dissenting:

The majority opinion orders that Alyeska, a private party, pay one-half on appellants' attorneys' fees. The other half, presumably the obligation of the Government, will not be paid because the Government cannot be assessed for costs in such cases. In awarding attorneys' fees against Alyeska the majority is promoting a continuance of some of the same errors that were contained in their initial opinion and which were in effect overridden by Congress in the enactment of the Alaska Pipeline bill.

The majority say they—

take the action of Congress approving the impact statement, not as a total rejection of the arguments made on appeal, but rather as a recognition that appellants had raised a very substantial question which the courts were likely to require considerable time to resolve and that, time being of the essence in providing for delivery of North Slope oil, a congressional resolution was required.

Op., *supra,* at p. 1035. The majority in straining for some acceptance of its judicial failure to act on the Environmental Impact Statement also quotes an article by Dominick and Brody. Op., *supra,* n.6. The referenced statement, however, is actually a serious criticism in a gentlemanly manner, of this court's refusal to perform its assigned judicial function. Certainly one cannot persuasively argue that Congress was the proper forum to determine the *judicial validity* of the Environmental Impact Statement.

To my view it is perfectly obvious that Congress' action in approving the Impact Statement by a rarely used legislative finding amounted to "a total rejection of the arguments made on appeal," because Congress would not deprive a court (this court) of its basic jurisdiction unless it felt that the court had misused its power in the past and could not, at least with respect to this case, be relied on in the future. Certainly the need for expedition was not the principal motive; if that were the case, Congress could simply have required a speedy decision by this court in the statute. Also, the issues dealt with in the Impact Statement were too important in the national scheme not to be properly resolved in a project of this tremendous magnitude. So Congress approved the Impact Statement, where this court had refused to even consider it, by declaring that the Alaska Pipeline should be constructed

as described in the Final Environmental Impact Statement of the Department of the Interior . . . *without further action under the National Environmental Policy Act of 1969* . . .[1]

Indeed, Congress went further and deprived this court of its normal right to judicially review decisions of the U.S. District Court under the Alaska Pipe Line bill by providing in effect that this court should not have jurisdiction of any claim challenging "the actions of the Federal officers concerning the issuance of the necessary rights-of-way [etc.] claims alleging the invalidity of [section 203(d)] . . . and [even] claims alleging [the denial of] . . . rights under the Constitution. . . ."[2] Certainly such drastic, unheard of and almost unprecedented action cannot be explained away on such self-serving grounds as the majority sets forth, *supra.* To my mind, the action by Congress is a plain indication that it considered the prior refusal of this court to perform its constitutional duty as an indication that it could not be expected properly to perform its duty with respect to this matter in the future.

1. P.L. 93–153, § 203(d), Act of Nov. 16, 1973 (emphasis added).

2. *Id.*

Then, to add insult to injury, the majority attempts to compensate attorneys for their work on the NEPA issue, the main objective of which sought to protect the *American* environment by compelling construction of the pipeline through Canada, a foreign country. The majority of this court did not consider the NEPA issue; instead it left it as a factor to be decided in the future, with the delay necessarily attendant to such deferred consideration. Congress, however, considered and found the NEPA Impact Statement to be adequate. So the efforts of appellants' attorneys with respect to NEPA drew a complete blank. Under such circumstances, it is unreasonable by any fair standard to compensate them for that phase of the case.

The majority assert that the Mineral Leasing Act issues "were somewhat interrelated with the NEPA issues." If this were so, it was all the more incumbent upon this court to examine them and render the decision required by the case presented. This argument by the majority is more in the nature of an improper *post hoc* rationalization.

Moreover, the main effect of appellants' NEPA claim would have been to subject a vital part of our energy supplies to the future veto of a foreign government. This would have been a continuation of the gross error made by the decision of this court in Natural Resources Defense Council v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972), which forced this nation to consider the alternative availability of foreign oil before the Government could allow any development of our own offshore oil resources. At that time (January 13, 1972), my dissent vigorously objected to such decision on the ground that *foreign oil could not be considered to be a "realistic alternative" because the objective of the Outer Continental Shelf Lands Act was to make this nation self-sufficient in oil.* To compel this nation to consider available foreign oil as a precondition to developing our own petroleum and energy resources was thus a complete negation of the objective of the Act. Significant language of my dissent which pointed to some of the hazards to which the court was thereby subjecting this nation stated:

In the event that all import quotas were removed and all the oil production of our Outer Continental Shelf could be replaced by foreign oil, it is common knowledge that such course would not be adopted because *the United States would then be wholly dependent upon foreign oil. We would be powerless as a nation to resist exorbitant prices for that oil, and we would be powerless to defend ourselves in a national emergency. It is thus essential to our national survival that we develop our own national production.* It seems plain to me that this is precisely the policy that Congress declared on August 7, 1953 when it passed the act authorizing the Secretary of the Interior, as a matter of national policy, to lease the lands of the Outer Continental Shelf for oil exploration. . . . In passing the Outer Continental Shelf Lands Act in 1953, Congress recognized the *"urgent need"* for developing our offshore oil.

Sec. 8. *Leasing of outer Continental Shelf.*—(a) In order to meet the *urgent need for further exploration and development of the oil and gas deposits of the submerged lands of the outer Continental Shelf,* the Secretary is authorized to grant . . . leases on submerged lands of the outer Continental Shelf

. . . .

Outer Continental Shelf Lands Act of 1953, § 8, ch. 345, § 8, 67 Stat. 468, *codified at* 43 U.S.C. § 1337 (1970) (emphasis added).

The national needs behind this congressional declaration of policy were also referred to in the committee reports which accompanied the bill for the Outer Continental Shelf Lands Act. *These stated that the development and operation of such lands through leases for oil and gas opera-*

*tions were vital to our national economy and security:*

> Representatives of the Federal departments, the States, and the offshore operators . . . were unanimously of the opinion, in which this committee agrees, that no law now exists whereby the Federal Government can lease those submerged lands, *the development and operation of which are vital to our national economy and security.*
>
> . . .

H.R.Rep.No.413, 83d Cong., 1st Sess. 2–3, 153, 1953 U.S.Code Cong. & Admin.News, p. 2178 (emphasis added).

> Congress has thus officially committed our government officials by statute to a policy of developing our offshore oil resources.

148 U.S.App.D.C. at 19–20, 458 F.2d at 841–842 (emphasis added). Nevertheless, the majority ignored the clear intent of Congress and compelled the Government to consider the alternative of *foreign oil.* They seek now to compensate a group whose principal objective, following this court's approval of the principle in NRDC v. Morton, *supra,* was to make our vital energy needs further dependent upon another foreign country. By contrast, I believe that the action of Congress in the Alaska Pipe Line Act, and current events in the Near East, effectively reverses the decisions of this court to the extent that they might reasonably be said to require consideration of any foreign alternatives prior to commencing development of our own vital energy resources. While we must suffer for the substantial delay caused by these misguided decisions, I refuse to concur in paying for the efforts of those who sought to further aggravate the injury.

For this reason I would refuse to compensate appellants' attorneys for any work they did on the NEPA issue—the main thrust of which would have made us further dependent upon another foreign nation, albeit our good neighbor, the Queen of the Snows to the north, for resources vital to our well-being as an independent nation. *When we subsidize lawyers to bring such suits against our national interests we promote our own destruction.* That we should not do.

In addition to recovery on the basis of an issue never decided by this court, appellants' victory here is premised on the narrow statutory interpretation issue on which they actually prevailed on the merits. This is a slender reed on which to rest recovery, however, for the width limitation surely was not the motivating force behind appellants' decision to institute legal action. Nonetheless, the majority seizes it with alacrity and raises it to such cosmic proportions that the issue becomes no less than "[t]he proper functioning of our system of government under the Constitution." Op. at p. 1033. This attenuated approach is demonstrably flawed when applied to Alyeska.

Assuming *arguendo* that forcing the Government to channel its actions within the law could be a valid basis for requiring the Government itself to reimburse appellants' attorney fees,[3] the argument fails as applied to Alyeska.[4] The majority, which discourses freely and at great length on how appellants' have benefited the public weal, apparently feels constrained to limit to three sentences its argument that makes Alyeska, a private party, liable for governmental actions:

> Fee shifting under the private attorney general theory, however, is not intended to punish law violators, but rather *to ensure that those who have acted to protect the public interest will not be forced to shoulder the entire cost of litigation. Cf.* Hall v. Cole, *supra,* 412 U.S. at 14, 93 S.Ct. 1943. After successfully persuading the Interior Department to grant the

---

3. The majority correctly points out that 28 U.S.C. § 2412 bars the imposition of attorney fees against the United States.

4. This discussion is equally applicable to the NEPA issue.

rights-of-way, Alyeska intervened in this litigation to protect its massive interests. Since Alyeska unquestionably was a major and real party at interest in this case, actively participating in the litigation along with the Government, we think it fair that it should bear part of the attorneys' fees.

Op. at p. 1036 (footnote omitted). Brevity is not always to be desired—especially on the pivotal issue of whether Alyeska should be held answerable for what the majority apparently perceives to be the sins of the Government. Perhaps this brevity, so admirable in other contexts, is attributable to an inability to marshal cogent arguments to support the proposition advanced; more likely, however, such brevity is required to mask sub silentio the major premise of the opinion. That is, oil companies are prosperous, appellants are poor, and therefore oil companies should finance both sides of this litigation. Thus the essence of the majority's argument is contained in the phrase "we think it fair"; the fact that the State of Alaska, also a party defendant and otherwise indistinguishable from Alyeska, escapes liability is an anomaly that also supports this reading of the majority opinion. Op. at p. 1036 n. 8.

Differing perceptions of justice and the public interest are understandable and to be expected, but a judiciary that in large measure depends for its influence on continued public confidence should, at a minimum, set forth in a frank and candid exposition the true bases of its decisions. Only in this manner can they fairly be judged.

For the reasons stated above I dissent from the payment of any fees to appellants.

WILKEY, Circuit Judge, joined by MacKINNON and ROBB, Circuit Judges, dissenting.

We respectfully dissent. It is difficult to see that either of these plaintiffs "acted as a 'private attorney general,' *vindicating* a policy that Congress considered of the highest priority." Judging from Congress' most recent action, these plaintiffs have been *frustrating* the policy Congress considers highly desirable and of the utmost urgency.

Nor do we agree that "this litigation may well have provided substantial benefits to particular individuals." Aside from the numerous lawyers involved, we are at a loss to know who those "particular individuals" enjoying "substantial benefits" might be. It is hard to visualize the average American in this winter of 1973–74, turning down his thermostat and with a careful eye on his auto fuel gauge, feeling that warm glow of gratitude to those public-spirited plaintiffs in the Alaska Pipeline case.

While no one questions the sincere motives of these "public interest" plaintiffs, it is not enough for a plaintiff to have a sincere feeling of self-righteous correctness in bringing litigation. There is the matter of *good judgment in assaying just where the public interest lies*. Did the plaintiffs exercise good judgment here in bringing suit to block the Alaska Pipeline? In retrospect, we submit they did not.

And in retrospect is precisely the way the award of attorneys' fees is always judged. By delaying the obtaining of oil from the North Slope of Alaska for several years, the plaintiffs conferred *no public benefit* on the United States of America.[1] Nor did they prevail on their principal legal argument with regard to the National Environmental Policy Act, for the District Court ruled *against* them on this issue and this court declined to rule at all. The plaintiffs did prevail on their subsidiary issue of the width of the right of way required, which Congress has now changed to per-

---

1. Without overlooking the speech of the Honorable Russell E. Train, relied on by the majority, it may be pertinent to inquire how this was interjected into the Record of this case on appeal. Certainly it does not appear that these rather broad generalities were ever subjected to any cross-examination. Significantly, these remarks were made in the comfort of last June; it is possible that this generous warmth of appreciation may have cooled by this December.

mit construction of the pipeline along the same route to which plaintiffs objected on environmental grounds, but alas, several years later.

This stands as plaintiffs' net achievement: the amendment of the 1920 Mineral Leasing Act to authorize a wider right of way, quite the opposite of the plaintiffs' objective to limit the right of way to 25 feet on each side. Against this public service must be weighed the public *dis*service in blocking access to the much needed oil at a critical time in our history, and the enormously higher cost we must all pay. As the majority states (p. 1032): "Each week's delay in constructing the pipeline imposed an additional $3.5 million in costs." This is $182 million per year. Plaintiffs' litigation has lasted over three and a half years, the delay is at least as long as the litigation, so construction costs have been upped *at least* $637 million—well over half a billion dollars, all of which will be paid for by the American consumer, when the oil finally arrives.

From the plaintiffs' legal failure and, in our opinion, substantial disservice to our country the majority of this court has managed to resurrect something of a victory for the plaintiffs, and in so doing has fashioned a dangerous precedent on attorneys' fees. The majority points out: ". . . the unavailability of attorneys' fees might significantly deter them from having brought this meritorious (sic) litigation" (p. 1032). "And denying fees might well have deterred appellants from undertaking the heavy burden of this litigation" (p. 1036). We are not impressed by the suggestion that the plaintiffs would not have sued, absent the prospect of legal fees to be paid by the defendants or the intervenors. At oral argument it was conceded that all counsel for the plaintiffs were salaried employees of the complaining organizations. This litigation must have been within the scope of the employment of these lawyers; indeed, the prosecution of litigation of this sort was one of the objects and purposes for which the plaintiff organizations were chartered and existed. We think it unrealistic to say that no suit would have been brought if the plaintiffs had not been able to count on the payment by others of the salaries of their staff attorneys. The plaintiffs were equipped and prepared to act, and no added financial encouragement was necessary.

With regard to other attorneys and potential plaintiffs, not so securely situated, the hope of attorneys' fees spawned by this ill-advised decision may be just the stimulus needed to launch them in the direction of the courthouse, embarrassed by any humility as to their knowledge of where the "public interest" lies. The flood of "public interest" litigation, particularly in the environmental field, is given a new impetus by the majority decision.

No authorities beyond those cited in the court's opinion need be cited to establish that plaintiffs are not entitled to attorneys' fees, because those authorities hold that, on any theory, to be so entitled, plaintiffs must show that they (1) prevailed on some important legal issue, and (2) conferred a public benefit. Without impugning plaintiffs' good intentions or demonstrated legal skills, as of December 1973 these plaintiffs have done neither. The award of legal fees is thus unjustified and unwise.

For mark this: no longer is it necessary for such plaintiffs to prevail on the legal theory of their case, nor to confer a discernible undisputed public benefit; it now suffices only to gain the sympathy of the court ultimately passing on legal fees for the substantive merits of plaintiffs' case, and, lo, plaintiffs can fail to prevail legally and dislocate the economy in trying, but can be awarded a consolation prize of attorneys' fees—in this case greater than plaintiffs woud otherwise have paid (Majority Opinion, pp. 1037–1038). The extraordinary and unprecedented nature of what the majority has done here could not be better described than by the majority itself in

footnote 9 (p. 1037). We can think of no greater encouragement to ill-founded litigation.

One further fact, making the action of the majority in awarding attorneys' fees even more astounding, must be brought out: counsel for plaintiffs, in pleading and by affidavit, *represented to the District Court that there would be no attorneys' fees charged in this case.* The venue of the case was retained in the District of Columbia only after repeated assurances to the court, by counsel who now demand attorneys' fees, that they were contributing their work without fee as a public service.

In response to the defendant Secretary's "Motion to Change Venue" of this Alaska Pipeline case to Alaska, one of plaintiffs' main points was that plaintiffs' Washington counsel had undertaken the representation for *"no fee,"* and that plaintiffs neither could afford to send these Washington lawyers to Alaska nor could plaintiffs obtain counsel in Alaska *"who would handle this case without fee".* Said plaintiffs' Memorandum of 19 July 1971 (emphasis supplied throughout):

> Plaintiffs' lawyers—members of a District of Columbia *pro bono publico* law firm *working for no fee*—have undertaken a massive, on-going legal effort, . . .
>
> . . . . . .
>
> . . . Lacking the resources to retain the services of a private law firm, Plaintiffs requested assistance from the Center for Law and Social Policy. *The Center agreed to furnish attorneys who would work without fee.*
>
> . . . . . .
>
> On March 23, 1970, Plaintiffs, through their *volunteer attorneys,* filed in this Court a Complaint
>
> . . . .
>
> . . . And, venue in the District of Columbia is not just a convenience to Plaintiffs, it is, for all practical

purposes, a *sine qua non* for continuation of this crucial litigation.

. . . . . .

### C. *Plaintiffs Inability to Litigate in Alaska*

The Center for Law and Social Policy, *which up to now has furnished Plaintiffs with attorneys for no fee,* could not under foreseeable circumstances afford to send its lawyers to Alaska to handle this case. (See attached affidavit of Charles Halpern)

. . . .

. . . [I]t does not appear that Plaintiffs will be able to retain substitute counsel. According to Plaintiffs' information, there are no *pro bono publico* lawyers in Anchorage who would handle this case *without fee;*

. . .

The probable effect of the transfer, therefore, will be to require Plaintiffs to discontinue the case.

Plaintiffs' Memorandum in opposition to any change of venue was supported by, among others, the affidavit of Charles R. Halpern, who as plaintiffs' counsel had signed the Memorandum from which the above quotations were taken. Said Mr. Halpern's affidavit:

> 2) The Center for Law and Social Policy is a nonprofit, tax-exempt corporation organized under the laws of the District of Columbia. The Center has a staff of full-time attorneys who . . . provide legal representation to groups and individuals who have previously been unrepresented in the federal decision-making process, primarily in the environmental, . . . Pursuant to that program, Center attorneys undertook representation of the plaintiffs in this case.
>
> . . . . . .
>
> 8) *Legal representation has been provided to the plaintiffs in this case without fee.* Plaintiffs have paid only litigation expenses, and the Wilderness Society has made a grant of

$5,000 to the Center to cover a part of the salary of Mr. Hillyer.

.   .   .   .   .   .

11) Had plaintiffs been forced to file or maintain this case in Alaska, it is clear that Center attorneys could not have participated effectively in the case, and, in my opinion, it is highly unlikely that plaintiffs would have been able to obtain the services of a staff of attorneys qualified to represent them.

Plaintiffs' position was further supported by the affidavit of Stewart M. Brandborg, Executive Director of The Wilderness Society, one of the three plaintiffs, who said:

2) The Wilderness Society is a non-profit corporation, incorporated in the District of Columbia. It has an annual budget of $1,100,000, . . .

.   .   .   .   .   .

6) The Wilderness Society has no unused income to devote to a major legal battle such as this case. *It is dependent on the services of pro bono lawyers such as Charles R. Halpern,* who reviews the services performed to date in this case in his Affidavit filed this date. The extent of The Wilderness Society's financial involvement in the case has been the payment since February 1, 1971, of one-half the modest salary of Saunders Hillyer (one of the several attorneys who have worked on this case) and in the payment of some out-of-pocket expenses such as those involved in duplication of documents and long distance telephone calls. *In the event of a transfer to Alaska, The Wilderness Society would be deprived of the free legal services provided by the Center for Law and Social Policy* and would have to hire private attorneys, if such are available (see Affidavit of Saunders Hillyer), to handle this case at the going rate in Alaska.

George Alderson of plaintiff Friends of the Earth concurred in his affidavit:

6) Friends of the Earth has only been able to conduct the above cap-

tioned case because of the *many hours of legal services provided without fee* by the attorneys as set forth in the Affidavit of Charles Halpern. Friends of the Earth has no resources with which to pay attorneys in Alaska

.   .   .   .

7) . . . [T]he undersigned, on behalf of Friends of the Earth, Plaintiff in this action, is of the opinion that *Friends of the Earth will be unable to conduct its case should it be transferred to Alaska* as requested by the Defendant.

Of like import was the affidavit of William A. Butler, Washington counsel for the third plaintiff Environmental Defense Fund:

4) EDF has been able to participate in the above-captioned case because of the *legal services provided without fee* by the attorneys at the Center for Law and Social Policy, as set forth in the Affidavit of Charles Halpern of July 1971. . . . [W]ithout the continued support of the co-plaintiffs in this case and without the continued use of *pro bono publico* lawyers, the Environmental Defense Fund would be unable to prosecute this case. [See affidavits of George Alderson of Friends of the Earth; Stewart Brandborg from The Wilderness Society; and Charles Halpern.]

In contrast was the affidavit of Peter LaBate, then (30 July 1971) President of the Alaska Bar Association. After referring to the number and character of counsel available to plaintiffs in Alaska, should the Secretary's motion for change of venue be granted, Mr. LaBate said:

Included are many lawyers of outstanding competence and experience, graduates of the most prestigious law schools in the United States. Many have distinguished records of *service without compensation* in cases of public importance and are thoroughly versed in federal law relating to land and the environment. . . .

As President of the Alaska Bar Association I recognize and accept the responsibility we have to provide counsel, particularly in cases of broad public significance, and if the *Wilderness Society Et al v Morton* is transferred to Alaska, our Bar will undertake to obtain for the Plaintiffs a *free* selection, on a basis acceptable to them from among the qualified counsel available.

The gist of the above is that one of the most vital points argued on the whole issue of whether to transfer venue to Alaska was the availability of *free* counsel to plaintiffs in Washington, D. C., and that to transfer venue meant as a practical matter that plaintiffs could not maintain their suit because of the absence of free counsel. When the President of the Alaska Bar argued the availability of counsel in Alaska, he did it on the *sine qua non* assumption of counsel "without compensation."

Plaintiffs represented to the District Judge that plaintiffs' counsel had received no compensation, expected to receive no compensation, and that competent counsel without fee were only available in Washington, D.C. Had it been represented to the District Court that plaintiffs' counsel would seek and be awarded, not only a fee equal to actual attorneys' costs incurred, but a fee in excess of "the amount actually paid or owed by appellants" (Majority Opinion, p. 1037), whether plaintiffs prevailed on their principal legal issues or not, *then the question of change of venue would have stood in a dramatically different light before the District Judge.* Plaintiffs could not have argued they would be deprived of counsel, either those already chosen or others, by a change in venue to Alaska or any other place. The lively expectation of such fees as may now be awarded would have brought many lawyers to plaintiffs' side, either in Alaska or elsewhere.

We feel that counsel should be held to the solemn representations they made to the court that the legal services they had rendered and would render in this case would be furnished gratuitiously. For the plaintiffs now to claim and be awarded attorneys' fees, in direct contradiction to their sworn representations to the court in July 1971, is intolerable.